LAKEWOOD HOMES, INC., APPELLANT, *v.* BOARD OF
ADJUSTMENT OF CITY OF LIMA ET AL., APPELLEES.

[Cite as Lakewood Homes, Inc., v. Bd. of Adjustment,
23 Ohio Misc. 211.]

(No. 53954—Decided March 30, 1970.)
Common Pleas Court of Allen County.

*Mr. Oren E. Dickason,* for appellant.

*Mr. John Evans,* director of law, and *Mr. Walter M. Lawson,* for appellee Board of Adjustment.

*Mr. Anthony Bowers,* for appellees Hughes et al.

HITCHCOCK, J.   (By assignment from Paulding County.)  If only Americans of color were able to acquire housing accommodations as easily as they can purchase Cadillacs the occasion for cases such as this would surely be rare.

This is an appeal from a decision of the Board of Adjustment (board) of the city of Lima, Ohio, affirming action of Roy C. Coon, Building and Zoning Supervisor, denying a building permit to appellant (Lakewood) for the erection of a modern twelve-building apartment complex, Northwood Homes, as follows:

1.   32—1 bedroom units to rent for $130 per month.
2.   112—2 bedroom units to rent for $150 per month.
3.   48—3 bedroom units to rent for $160 per month.
4.   8—4 bedroom units to rent for $175 per month.

The building of which is to be accomplished with funds provided under the Rent Supplement Act of 1965 and amendments thereto.[1]

---

[1] This Act, signed by President Lyndon B. Johnson on August 10, 1965, was enacted as a part of the Housing and Urban Development Act of 1965 and was classified in part to Title 12, Banks and Banking, U. S. Code and in part to Title 42, Public Health and Welfare.  It was in a few particulars amended in 1967 and 1968 and enables the Secretary, H. U. D., under appropriate regulations and when funds are appropriated to pay up to 70% of the rent for defined "low and moderate rental housing."  As is typical of such Acts, I perceive it to be long, prolix and requiring weeks of concentrated study for a reasonably comprehensive grasp of its provisions, some of which seem far from clear.

Doubtless Section 1701s (c), Title 12, U. S. Code, is the chief cause of the great local opposition to Lakewood's proposed development. It reads:

"(c) As used in this section, the term 'qualified tenant' means any individual or family who has, pursuant to criteria and procedures established by the Secretary, been determined—

"(1) to have an income below the maximum amount which can

For reasons hereinafter stated the action of the Board of Adjustment is reversed and remanded with instructions, and law applicable to this case is declared.

In 1968 when the writer accepted assignment to this case he had no knowledge of its nature and might well have begged off had he known. It having, nevertheless, fallen to his lot, he shall discharge his duty as bound by oath and conscience. At the conclusion of the evidence on February 25, 1969, the court assured counsel that a thorough study of the issues presented would be made. It also asked that briefs be filed. By March 24th, all parties had filed briefs in support of their views. The court now freely confesses that it did not then know what a task it had set for itself.

Ostensibly, this is a simple little case involving no more than a decision as to whether Section 1303.01 of the Codified Ordinances of Lima (C. O. L.) is constitutional or whether the board in interpreting it has acted lawfully or not. It appears to the court, however, to be far more than that. For if the matters here in controversy cannot be re-

---

be established in the area, pursuant to the limitations prescribed in Sections 1402 (2) and 1415 (7) (b) (ii) of Title 42, for occupancy in public housing dwellings; and

"(2) to be one of the following—

"(A) displaced by governmental action;

"(B) sixty-two years of age or older (or, in the case of a family to have a head who is, or whose spouse is, sixty-two years of age or over);

"(C) physically handicapped (or, in the case of a family to have a head who is, or whose spouse is, physically handicapped);

"(D) occupying substandard housing; or

"(E) an occupant or former occupant of a dwelling which is (or was) situated in an area determined by the Small Business Administration, subsequent to April 1, 1965, to have been affected by a disaster, and which has been extensively damaged or destroyed as a result of such disaster.

"The terms 'qualified tenant' and 'tenant' include a member of a cooperative who satisfies the foregoing requirements and who, upon resale of his membership to the cooperative, will not be reimbursed for an equity increment accumulated through payments under this section. With respect to members of a cooperative, the terms 'rental' and 'rental charges' mean the charges under the occupancy agreements between members and the cooperative."

solved so that the policy declared by Congress in the Housing Act of 1937 as amended,[2] can be substantially realized as a practical matter, I perceive that millions of Americans of every hue who could be better housed are going to remain ill housed.   We first consider—

THE PARTIES AND THEIR VIEWS OF THE LEGAL ISSUES

Appellant corporation is wholly owned by its president, Ben C. Cogen. He is an established builder of new, modern homes, having built in the past 25 years approximately 700 houses in the vicinity.   About half of these houses sold for $15,000 or less; about half at prices between $15,000 and $23,000, all prior to January 1, 1968.   Franklin Realty Company (Franklin) owns a 13.601-acre vacant tract of land lying just south of Brower Road (an east-west street marking the northern boundary of the city of Lima) and just west of certain east facing properties fronting on North West Street (also known as State Route No. 65). Appellant has control of the development of this tract by reason of some arrangement with Franklin.

---

[2]See 50 Stat. 888 (1937); 73 Stat. 654 (1959) and 82 Stat. 504 (1968) now found in:

42 U. S. Code, Health and Welfare, at

Section 1401.   Declaration of policy.

It is declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban, rural nonfarm and Indian areas, that are injurious to the health, safety and morals of the citizens of the Nation.   In the development of low-rent housing it shall be the policy of the United States to make adequate provision for larger families and for families consisting of elderly persons.   It is the policy of the United States to vest in the local public housing agencies the maximum amount of responsibility in the administration of the low-rent housing program, including responsibility for the establishment of rents and eligibility requirements (subject to the approval of the Authority), with due consideration to accomplishing the objectives of this chapter while effecting economies.

As amended Aug. 1, 1968, Pub. L. 90-448, Title II, 206 (a), 82 Stat. 504.

The action of the board was determined at a second open meeting after public notice, both sessions being attended by counsel and some parties on August 7 and 14, 1968. The conclusory minutes of the board were reduced to writing and signed on or about August 28, 1968. See Appendix II. This appeal is from the decision recorded in these minutes.

On September 5, 1968, Lakewood (at times also referred to herein as appellant and/or Cogen) filed with the deputy secretary of the board its ''Notice of Appeal from Agency of a Political Subdivision'' alleging error in sustaining denial of mentioned building permit for the reasons given by the Building and Zoning Supervisor, to wit:

(1) That Lakewood's plans were not approved by the City Planning Commission and the City Council under Section 1303.01 C. O. L. (Codified Ordinances of Lima).

(2) That if not, the board acted unreasonably in light of the evidence before it in interpreting Section 1303.01 C. O. L. as specifically charged in six separate paragraphs.[3]

On September 6, 1968, this notice of appeal and a transcript from the board were filed in this court.

In its brief filed March 3, 1969, Lakewood alleges as issues made the following:

''1. Was the appeal by the appellant from the Board of Adjustment to the Common Pleas Court timely filed?

[3]Appellant's "Application for a Variance and an Appeal From the Decision of the Building and Zoning Supervisor Denying a Building Permit" addressed to the Board of Adjustment or the City of Lima concluded with this prayer—

"Wherefore, applicant requests the Board of Adjustment to grant a variance from strict compliance with subsection (i) of Section 1335.01 to permit the placement of the apartment buildings in accordance with the plot plan filed with the application for the permit and for the Board of Adjustment to issue the requested building permit conditioned (1) that a buffer screening area be provided in accordance with the City Code, (2) that grounds numbered four and five of refusal of the Building and Zoning Supervisor be eliminated by complying with the applicable sections of the Ohio Building Code or securing the excuse of their compliance from the Building Appeals Board or the city of Lima, and (3) providing surface drainage from said premises to the satisfaction of the Engineer of the city of Lima."

"2. Is Section 1303.01 C. O. L. so vague, indefinite, lacking in standards and criteria that it is not capable of application?

"3. Does the lack of standards and criteria in Section 1303.01 C. O. L. constitute an improper delegation of legislative authority by Lima City Council to City Planning Commission and/or the Building and Zoning Supervisor to make it in violation of the XIV Amendment to the United States Constitution and to Sections 1 and 19 of Article I of the Ohio Constitution? In other words, does Section 1303.01 C. O. L. deny the appellant of the due process of law and constitute an unlawful taking of his property?

"4. Does the manner in which Section 1303.01 C. O. L. as interpreted and applied by City Planning Commission, Building and Zoning Supervisor and Board of Adjustment of the City of Lima and refusal to grant the variance result in the appellant having been denied the equal protection of the law?"

In the brief submitted for the city in behalf of the board and in that of the adjoining and nearby landowners (neighbors), both filed March 17, 1969, defense counsel agree that mentioned issues numbered 1, 2 and 3 are presented but contend that the facts do not truly raise the issue alleged by appellant under number 4.

The court agrees with appellant that all four issues were properly raised and respectively finds: (1) that the appeal was timely filed and that the court has full jurisdiction; (2) that Section 1303.01 C. O. L. is not unconstitutionally vague and indefinite; (3) that Section 1303.01 C. O. L. on its face is not violative of Amendment XIV, U. S. Constitution or of Sections 1 and 19, Article I, Ohio Constitution; and (4) that the action of the board is illegal because based only upon superficially plausible reasons lacking the equity required by (1) general equitable principles and (2) the prohibition against deprivation of rights provided by Title 42, U. S. Code, Section 1983 (R. S. 1979, Act Apr. 20, 1871, C. 22, 1, 17 Stat. 13) reading:

"Every person who, under color of any statute, ordinance, regulation, *custom,* or *usage,* of any State or Territory, subjects or causes to be subjected any citizen of the

United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in *an action at law, suit in equity,* or *other proper proceeding* for redress. (Emphasis supplied.) Moreover, the words "Constitution and laws" in the foregoing paragraph embrace the words "Private property shall ever be held inviolate but subservient to the public welfare * * *" found in Section 19, Article I, Ohio Constitution,[4] as well as those of Sections 1981 and 1982, Title 42, U. S. Code, Health and Welfare.[5]

[4]These sections of Article I, Ohio Constitution, respectively, read:
"1. *Inalienable rights.*
"All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."
"19. *Private property inviolate, unless etc.*
"Private property shall ever be held inviolate but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money: and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner."
[5]Title 42, The Public Health and Welfare, U. S. Code, Chapter 21—Civil Rights, Subchapter I reads at—
Section 1981. *Equal rights under the law.*
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. R. S. Section 1977. (Historical Note—Derivation. Act May 31, 1870, c. 114, Section 16, 16 Stat. 144.)
Section 1982. *Property rights of citizens.*
All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property. R. S. Section 1978. (Historical Note—Derivation. Act Apr. 9, 1866, c. 31, Section 1, 14 Stat. 27.)

R. C. 2506.01, providing for *"Appeal from decisions of any agency of any political subdivision,"* incorporates by reference, unless otherwise modified, the statutes governing appellate procedure generally in the courts, R. C. 2505.01 to 2505.45. R. C. 2505.04 reads:

"An appeal is perfected when written notice of appeal is filed with the lower court, tribunal, officer, or commission. Where leave to appeal must be first obtained, notice of appeal shall also be filed in the appellate court. After being perfected, no appeal shall be dismissed without notice to the appellant, and no step required to be taken subsequent to the perfection of the appeal is jurisdictional."

R. C. 2505.07, *Time for perfecting appeal,* in pertinent part reads:

"After the journal entry has been approved by the court in writing and filed with the Clerk for journalization, or after the entry of other matter for review, the period of time within which the appeal shall be perfected, unless otherwise provided by law is as follows:

"(A) Appeals to the supreme court or to courts of appeals, or from the municipal courts and from probate courts to courts of common pleas, shall be perfected within twenty days. * * *

(Paragraph re new trials in courts omitted.)

"(B) *All other appeals shall be perfected within ten days.*

"(C) In case of the insanity or death of a party after judgment, the court may extend the time for filing the appeal, an additional twenty days.

"This section applies to any action or proceeding pending in the courts on the effective date of this section." Effective 10-27-1953. (Emphasis supplied.)

By reason of the foregoing statutes it is very clear that until the minutes of the board's meeting and final decision made on August 14, 1968, were reduced to writing and filed with the deputy secretary of the board on August 27, 1968, there was no "entry of * * * matter for review." Clearly the "notice of appeal" was in writing, was filed, and specifically indicated the matter and action appealed from. Moreover, it was filed with the deputy clerk of the

board on September 5, 1968, just 8 days after the "matter for review" was entered on the board's records in the office of the Deputy Secretary. *Sun Oil Co.* v. *Board of Zoning Appeals* (1966), 9 Ohio Misc. 101, is substantially in accord with the view of this court.

Turning now to the second issue we find the text of Section 1303.01 C. O. L. to read:

"*Development plan.*

"The owner of any tract of land shall submit to the City Planning Commission a plan for the use and development of such tract of land primarily for residential purposes and if such development plan is approved after public notice and hearing by the City Planning Commission and by the City Council, the application of use, height, area and yard regulations established herein shall be modified as required by such development plan, provided that for the tract as a whole excluding street area, but including area to be devoted to parks, parkways or other permanent open spaces there will not be less than the required area per family for the area district in which such tract of land is located for each family which under such development plan may be housed on such street. And provided further that under such development plan the appropriate use of property adjacent to the area included in such development plan is fully safeguarded (1949 Code, C. 34, Section 27)."

Appellant contends the words "tract" and "fully safeguarded" as found in the ordinance have no definite meaning and also that the words "if such development plan is approved" provide no standards of performance for either the City Planning Commission or the City Council who are to do the approving of the "plan for the use and development" which every "owner of any tract" must submit when the use is "primarily for residential purposes after public notice and hearing."

The court, finding that a number of the neighbors had appeared before the board and the City Planning Commission (commission) and had objected to and protested against Lakewood's proposal, overruled appellant's objection to their being made parties herein. The court also overrules the neighbor's contention that this appeal should

be dismissed because Lakewood is not the "owner" of instant 13.6-acre tract. In the opinion of the Supreme Court of Ohio in *Grieser* v. *Huntington National Bank* (1964), 176 Ohio St. 291, at page 294, it is said:

"The word 'owner,' as used in various statutes is one of flexible meaning, depending on the language and purpose of the particular statute in which employed, and it may vary from an absolute proprietary interest to a mere possessory right. *Animal Rescue League* v. *Assessors of Bourne*, 310 Mass. 330, 333, 37 N. E. 2d 1019, 1021, 138 A. L. R. 110, 113."

In zoning regulation what is important is who has power of control of the land or structure in question. As not the slightest evidence contradicts appellant's evidence that it has an arrangement with Franklin Realty Company so that it has control of this land to use it for the proposed apartment complex the court finds that for the purpose of Section 1303.01 C. O. L. appellant Lakewood is the owner of the land affected by its proposed apartment house development thereon.

The court agrees that the provisions of Section 1303.01 C. O. L. are to be considered as a part of the entire Planning and Zoning Code—Part Thirteen of the Codified Ordinances of Lima (Code) and are to be interpreted in that light. This means that the commission and council do not have unfettered discretion to disapprove any plan submitted. They may only disapprove development plans which are violative of the legitimate purposes of the Planning and Zoning Code. This means that they may—

(1) Disapprove nonconforming uses under the existing code, *a proposal which is not here made.*

(2) They may disapprove for failure to meet legitimate quality standards for construction materials.

(3) They may disapprove for failure to meet legitimate and known requirements for buffer screening areas.

(4) They may disapprove for failure to meet known and legitimate standards for floor area and outside space.

(5) They may disapprove for failure to meet fire and other legitimate exit regulations.

(6) They may disapprove for failure to meet known

and legitimate drainage and sewage disposal requirements —and for other similar legitimate reasons.

(7) They may not disapprove for no reason, for reasons of mere bias or antipathy, or for a wrong interpretation of the existing code—here the objection that Section 1335.01 (i) C. O. L. requires that "Every dwelling shall face on a public street." or for reasons which deny nationally secured rights.

(8) They may disapprove because the surrounding area is not "fully safeguarded" as those words are legitimately defined.

An examination of the entire Lima Code discloses that it incorporates by reference the Sections 713.01 *et seq.* "Planning Commissions" and Sections 711.08 *et seq.* "Plats" of the Revised Code of Ohio, and asserts "* * * Unless specifically regulated by the Charter of the City, or by ordinance passed by the Council of the City, all powers, authority and procedure shall be governed by the Ohio Revised Code," Section 1307.07 C. O. L.

Section 1311.28 C. O. L. reads:

"A *lot* is a parcel of land occupied or designated to be occupied by one building and the accessory buildings or uses customarily incident to it, including such open spaces as are required by this Code and such open spaces as are arranged and designed to be used in connection with such building. Such lot may or may not be the same as the lot in recorded subdivision.

"Lot shall include 'plot.' (1949 Code, C 34 Section 33.)"

No similar definition is given for the word "tract of land." In light then of the Code and common experience the court finds that "tract of land" here refers to any land area occupied or designated to be occupied by more than one building or one building larger than a "dwelling" as that word is defined in Section 1311.15 C. O. L. reading "A *dwelling* is a building arranged, intended or designed to be occupied by not more than four families living independently of each other and doing their own cooking upon the premises. (1949 Code, C. 34 Sec. 33.)"

As the plan presented is an apartment house plan the

units of which are not "dwellings" as just defined it is clear that any objection that they do not face a public street is no violation of Section 1335.01 (i) reading: "Every dwelling shall face upon a public street of not less than fifty feet in width and no dwelling shall be built on a plat of ground less than fifty feet in width. (Ord. 9-52. Passed 2-11-51.)"

It is clear from the testimony that Lakewood's purpose has been and is to build a modern, good quality 12 building —200 unit—brick veneer apartment house complex which will in all likelihood cost at least $2,000,000. At the time of the hearing in this court architect plans were exhibited for which Mr. Cogen testified, plaintiff was then obligated to pay $65,000. The apartments are designed for rent to persons of moderate income in today's world.[6]

In the opinion of this court the commission may "fully safeguard" the surrounding area by requiring protection from unusual air pollution, from stagnant water produced by improper drainage, from dinning noises substantially in excess of those normally in the area, from lack of buffer zones commonly provided. But "fully safeguarded" cannot be legitimately interpreted to deny appellant the use of its land as it desires to use it when otherwise in conformity to known law, nor to deny to it or its successors

[6]Joint Exhibit 3, pamphlet issued by H. U. D.—May, 1966—E. H. A. No. 2504 entitled "RENT SUPPLEMENT PROGRAM—Public Information Guide and Instruction Handbook" at item IX, p. 5, there is provided, in respect to maximum gross monthly rental, the following: 1 bedroom unit, $105.00; 2 bedroom unit, $120.00; and 3 or more bedrooms, $140.00; and adds, "In high cost areas, the maximum rentals may be increased up to 25 percent where necessary." The item concludes with this short paragraph:

"Unit rentals will be gross rentals and will include all utilities except telephone. Kitchens will contain a cooking stove and refrigerator."

Thus it seems clear that the monthly rental must eventually be applied to cover cost of land and building furnished with a stove and refrigerator for each unit, interest on investment and limited dividends therefrom along with taxes, heat, light, water, sewage, garbage removal, and general maintenance.

The rentals testified to in this hearing, although unexplained, are, it is noted, within the limits of these provisions.

the rental of such land as developed to persons for whom the neighbors have for any reason extreme antipathy, or to deny to any citizen the opportunity to rent or buy from any landlord with whom he may strike a bargain.

The court now reviews the action of Mr. Coon, Building and Zoning Supervisor,[7] who denied the building permit to appellant in this case; the first building permit ever refused Mr. Cogen in hundreds of applications made personally or by one of his companies.

On July 23, 1958, Mr. Coon, in his official capacity, wrote Mr. Cogen as president of plaintiff corporation, as follows:

"This letter is to inform you that a building permit to construct an apartment complex at 409 Brower Road, Lima, Ohio, is denied. Basis for this decision are the following items:

"1. The development plan has not been approved by the City Planning Commission and City Council. (Sec. 1303.01, C. O. L.)

"2. Every dwelling shall face on a public street. Sec. 1335.01, subsection (i) C. O. L.

"3. A buffer screening area has not been provided. Sec. 1321.03 C. O. L.

"4. The floor area of units 4A in buiding Number 7 on the second floor exceeds the allowable maximum for building of U-A construction. (Sec. BB-53-07, O. B. C.)

"5. A second exit is required from units 4A in building Number 7. (Sec. BB-53-12, O. B. C.)

"6. The lot shall be graded to prevent the drainage of surface water onto adjacent property, plus proper drainage shall be provided along Brower Road.

"You are advised of your right to appeal this decision by filing a written application for a variance in accordance with Section 1315.05 of the Zoning Code, with the Board

---

[7]Although Mr. Coon testified that this is his title, he is in this record both addressed as such and as the Building and Zoning Administrator (or Admr.) even though Section 1313.01 C. O. L. reads: "This Zoning Code shall be enforced by the Inspector of Buildings under the rules and regulations of the Board of Adjustment. (1949 Code, C. 38, Section 25.)"

of Adjustment, Mr. Malcolm Basinger, Deputy Secretary, 607 Savings Building, Lima, Ohio on items 1, 2 and 3.

"On items 4 and 5, an appeal may be made in accordance with Section 106.11 of the Building Code, by filing a written petition with Mr. James Schmenk, Building Commissioner, 219 E. Market Street, Lima, Ohio.

"Item number 6 shall be resolved to the satisfaction of the City Engineer."

He then concluded the letter and indicated one copy each for the "Director of Law" and another for the "City Engineer."

The next day, on July 24, 1968, plaintiff by its attorney filed its "Application for a Variance and an Appeal from the Decision of the Building and Zoning Supervisor Denying a Building Permit," addressed to the Board.

This leads the court to consider the—

PROCEEDINGS PRIOR TO DENIAL OF BUILDING PERMIT

Sometime about January 1968, Lakewood obtained F. H. A. (Federal Housing Authority) clearance as to quality and a commitment to provide funds for Northwood Apartments as a Rent Supplement Act apartment house project. Sometime—perhaps 6 or 8 weeks—thereafter someone in the F. H. A. office in some way communicated this fact to someone of the city officials and the news apparently spread rapidly, and the project was viewed and examined closely.

Thereupon, Section 1303.01 C. O. L. was recalled and invoked for only the second time in 20 years. The other occasion, in respect to Criterion Homes—with 84 apartment units—was made in January 1968, when Mr. Coon told Criterion he believed Section 1303.01 C. O. L. applicable. Thereupon, Criterion presented plans which were approved by the City Planning Commission and the City Council. See Appendix III. It was never precisely disclosed what objections were made to Criterion's original plans. Nor is the special ordinance set out in mentioned appendix informative in this respect. It is clear, however, that no provisions of the Rent Supplement Act were in-

volved, nor was any issue made as to any rights under Section 1982, 42 U. S. Code, Health and Welfare.

Mr. Cogen, for Lakewood, testified that it was his intention and purpose, in the preparation of the plans for Northwood Apartments to comply with every provision of the Code and Building Regulations and that objections of Mr. Coon, as Building and Zoning Supervisor, numbered 3, 4, 5 and 6 were oversights, which Lakewood stands ready and willing to correct. Viewing the project as a whole, and the extent and complexities of the detailed plans, the court can find nothing incredible in this testimony, and there is no evidence in the record to contradict it. Consequently, the court accepts it as true.

When Lakewood was told that compliance with Section 1303.01 C. O. L. was a necessary step toward obtaining a building permit (even though Lakewood's counsel disagreed that this was so), Lakewood, through its counsel, wrote a letter as follows:

"April 23, 1968

"City Planning Commission
Lima, Ohio
"Gentlemen:

"Lakewood Homes, Inc., is the owner of a 13.601 acre tract of land in the City of Lima fronting on the south side of Brower Road. This tract is presently zoned Class II Business. The owner submits a plan for the use and development of this tract primarily for residential purposes. The plan consists of Parts A and B, and is submitted under Section 1303.01 of the Codified Ordinance of the City of Lima.

"The owner requests that public notice and hearing be had by City Planning Commission and by the City Council as provided in the Ordinance.

"Respectfully submitted
"Lakewood Homes, Inc.
By /s/ Oren E. Dickason
Its Attorney"

Thereupon the commission caused to be published in The Lima News on April 26, 1968, the following Legal Notice:

"Notice is hereby given of a public hearing to be held in conformity with Section 1303.01 C. O. L., by the City Planning Commission of the City of Lima, Ohio, at 4:15 p. m., on the 22nd day of May, 1968, in the Council Chambers of the said City, located at the northwest corner of East Market Street and Central Avenue, in the said city, relative to the development plan filed with the Commission by Lakewood Homes, Inc. The premises so involved are more particularly described as follows, to-wit:

"A parcel of land of approximately 13.6 acres, bounded on the north by Brower Road, on the west and south by Northland Subdivision, and on the east and northeast principally by Timmerman Sales Company; and also located along the south side of Brower Road approximatey midway between North Metcalf Street and North West Street.

"Any person or persons interested in the subject of this hearing and desiring to be heard on the said matter will be heard at the time and place hereinbefore designated.

"The development plan, along with all exhibits thereto, may be inspected prior to the said hearing in the office of the City Planning Commission of the City of Lima, Ohio, 607 Savings Building, Lima, Ohio 45801.

"City Planning Commission
Malcolm D. Basinger, Deputy Secretary."

During the time of these proceedings from January 1, 1968, through March 17, 1969, membership of the commission and board was as follows:

*City Planning Commission*
1. Hon. Christian C. Morris, Mayor & Ex-Officio Member.
2. Hon. Frank D. Cory, Attorney.
3. Hon. Earl F. Ghaster, Sr., Outdoor Advertiser.
4. Hon. John W. MacDonnell, City Loan & Savings Co. Executive
5. Hon. Gary Smith, Realtor.

*Board of Adjustment*
1. Hon. Frank D. Cory, Attorney.

2. Hon. Earl F. Ghaster, Sr., Outdoor Advertiser.
3. Hon. John W. MacDonnell, City Loan & Savings Co. Executive.
4. Hon. Robert Grimes, Civil Engineer.
5. Hon. Ted Wilson, Psychologist.

The Honorable Malcolm D. Basinger, attorney, is Deputy Secretary to both of these bodies. The Mayor, who is elected by the general electorate, appoints all other members of both bodies. Although the court notes that the dual positions of Messrs. Cory, Ghaster and Mac-Donnell on both commission and board might be found to be incompatible, no party has made any objection for such reason and for the purpose of this decision the court finds it is now too late to raise such issue in this case.

Upon publication in the April 26, 1968, issue of The Lima News (Lima's daily paper) it was discovered that not a few Lima residents—chiefly neighbors, were interested in the matter and an uncounted number attended the session of the City Planning Commission on May 22, 1968, which appears to have been continued to May 29, 1968, and further continued to June 26, 1968, at which time the commission found that Mr. George L. Kruse, Jr., City Planning Director and resident of the Northland area, was not biased and prejudiced, that the project was located in an inappropriate area despite an appropriate use under the zoning code, and declined to approve the development plan, or to refer it to City Council for consideration,[6] whereupon

---

[6]From the next to the last paragraph of the minutes of the City Planning Commission re its meeting on June 26, 1968, it is clear that it refused to transmit the record of its proceedings declining to approve appellant's Northwood Apartments development plan and that it did so pursuant to instructions of the city's Director of Law. On July 8, 1968, appellant's counsel by letter asked that said paragraph be amended by adding to the second sentence of said paragraph so it would read, "* * * The Deputy Secretary reiterated his prior opinion that the matter was now to be retired as far as the commission was concerned, based on his understanding of the ruling of the Director of Law (and transmittal of these proceedings to city council is denied)." Parentheses enclose the words of request.

On July 18, 1968, the deputy secretary by letter replied for the commission in pertinent part:

Mr. Coon refused to issue a building permit to plaintiff.

Other proceedings, however, had been had before Mr. Coon acted. On April 3, 1968, Mr. Kruse wrote Mr. Roy D. Allen, Director, Federal Housing Administration in Columbus, Ohio as follows:

"Locally, unofficial questions have been raised regarding a proposed rent supplement project, Northwood Apartments in Lima, Ohio.

"Under Section 1303.01 of our Zoning Code, a development plan of this nature requires a public hearing and approval by the City Planning Commission and city Council. A Site Plan should be submitted to the Council and Planning Commission for a given project if located within the city limits at an early date.

"If a preliminary conference was held with the director concerning the proposed Northwood Apartments in Lima, Ohio, please supply our office with a copy of the minutes. In addition, please advise of your estimate of economic rents for various size units in the proposed Northwood Apartments project."

Before the Planning Commission, at its hearing on May 22, 1969, this letter received on April 12 was read in full by Mr. Kruse, and its meaning referred to. Mr. Dickason, attorney for appellant, argued that the Rent Supplement Act should constitute no part of the commis-

---

"* * * The Minutes of July 10 speak for themselves * * *, but I have been instructed to write this letter to you * * * to indicate that the Commission did not, nor does it now, entertain any intention whatsoever of transmitting its action relative to the captioned application to city council. This commission wished that I make this quite clear to you in the event that the minutes as prepared do not satisfy you on this particular point.

"I suppose that I should add, in addition to the action taken by the commission, my own comment that it is my position as deputy secretary that I would be in error if I were to transmit this to city council based on the verbal opinion given to me by the Director of Law of this city and the instructions of the commission."

As the ordinance is worded in the conjunctive, and the city exercises home rule powers, I consider this refusal as a perfectly legitimate interpretation of Section 1303.01, C. O. L. and as laying a proper ground for appeal to the Board of Adjustment under the Lima Code.

sion's consideration of the proposed development plan. Mr. Kruse apparently thought otherwise and stated "I wish to . point out, further, that I have been contacted initially by an individual from the Federal Housing Agency of Columbus who requested verbally from my office * * * what was the City Planning Commission's position regarding Northwood Apartment Project—the rent supplement program."

Thereafter a motion was carried to request from the city's law director an "opinion * * * pertaining to the exclusion in public hearing consideration of the rent supplement program, Northwood Apartments, pertaining to the development plan proposal, including location." An excerpt showing the entire colloquy is shown in Appendix IV.

At the continued hearing on May 29, Mr. Dickason charged that Mr. Kruse had a bias against the project and expressed an opinion that Mr. Kruse lived in the area and had organized or was a part of a group opposed to the project. Appendix V shows a full excerpt from the minutes.

On May 29, 1968, the Law Director issued his Opinion No. 29-68 to the City Planning Commission. The concluding paragraph reads:

"Even though the City Planning Commission and the City Council may not base their ultimate decision on the type of prospective occupants of such rental units, it is my opinion that at a public hearing it is not improper to permit such type of discussion. Since the City Code calls for a public hearing, the rent supplement matters should be allowed to be introduced and the City Planning Commission or the City Council, as the case may be, can use its own judgment as to the necessary weight such testimony may have in arriving at their ultimate decision."

I perceive there is little point in having a public hearing if the members appearing are not permitted to air their views and would exclude nothing having any relevancy or believed relevancy to the matter at hand. But municipal officials who must make decisions affecting others do not have unfettered discretion in making official judgments. Like judges, they are sworn to uphold the Consti-

tutions of the United States and the state of Ohio, and to faithfully discharge the duties of their office. Ohio judges are, in addition, sworn to administer justice without respect to persons. Consequently, all public officials are bound to discharge the duties of their office regardless of praise or blame, deserved or undeserved, and despite public clamor in support of or opposition to the project under official consideration. Naturally, in a free country—or at least in one where individual freedom is widely, if not everywhere perfectly, enjoyed by all—where freedom is deeply treasured in the minds and hearts of nearly all, interests and desires which are incompatible and conflicting inevitably appear. When brought to court it becomes the task of the law to resolve them in ways as fundamentally fair and peaceable as possible, but definitely in a way honest men may at least call approximately just.

When we seriously begin to deal with the concept of freedom or liberty, we discover these words spoken by Abraham Lincoln when he addressed the Baltimore Sanitary Fair on April 18, 1864: "The world has never had a good definition of the word liberty, and the American people, just now, are much in want of one." Today, 106 years later, the American people are still much in want of such a definition. Although much evidence may easily be obtained that the American people enjoy more individual liberty than any other, there is perhaps as much easily available evidence that no people are more lawless than the American. Providing for all freedom under law which produces a high degree of personal liberty combined with as great a degree of both justice and safety to the unoffending citizen, whatever his color, office or status, is no easy task. Sir Henry Maine, in 1861, completed the original edition of his classic work "Ancient Law," which was to be republished in no less than 10 later editions. Upon review of a large sweep of the world's general and legal history, he concluded that "Nothing has been so distasteful to mankind, either individually or in the masses, than to admit the fact of their moral progress as a substantive reality."

See p. 67, 5th Eng. Ed., Henry Holt & Company, New York, 1875.[9]

Frederic Bastiot, in his work "The Law" (1850), quoted a friend who said "* * * the statement, *the purpose of the law is to cause justice to reign*, is not a vigorously accurate statement. It ought to be stated that *the purpose of the law is to prevent injustice from reigning*. In fact, it is *injustice*, instead of justice, that has had an existence of its own. Justice is achieved only when injustice is absent." Quotation from Dean Russell translation—The Foundation for Economic Education, Inc., Irvington on Hudson, N. Y., 1956, pages 28, 29.

So, although the City Planning Commission is privileged to hear any objections from any person in interest, it is not free to weigh objections whose effect is to deny a builder's constitutional right to private property with substantial dominion over it or a lawful dominion over it on the meretricious ground of a risk of lowered property values.

We now examine the proceedings before the City Planning Commission.

Mr. Kruse made a 9 page letter report to the Commission dated May 22, 1968, parts of which read:

"Under Section 1303.01 of the Lima Planning and Zoning Code, Lakewood Homes, Inc., has submitted site development plans for the proposed Northwood Apartments which require City Planning Commission and City Council approval thereof. * * *

"The City Planning Commission, as one of the reviewing authority units under our Code, may approve the ap-

[9]In the layman's world the great lady poet (white) Edna St. Vincent Millay, concluded her sonnet "Pity Me Not" with these words:
"Pity me that the heart is slow to learn
"What the swift mind beholds at every turn."
Surely most of us recognize how difficult it is to do what our intelligence and sense of right tells us we should do in those areas of conduct where it is difficult to refrain from thinking, "What will my friends think?" or "What will the neighbors think?" or "What will people say?"

plication, reject it or prescribe further conditions before granting approval.

"At the present time the entire apartment site is zoned for Class II Business under the Lima Zoning Code. In addition, Timmerman Sales Company property and other properties south thereof are included in the Class II Business District classification. The properties, which are presently residentially occupied and which face Highway Route 65 on the west side thereof, are in a Class I Business District. All of the platted portions, however, of Northland Subdivision proper are zoned Class I Residential.

"* * * [Comments on details and deficiencies are omitted here].

"PLANNING RECOMMENDATIONS":

"1. That prior to City Planning Commission action on the Northwood Apartments Development Plan, the property in question should be rezoned from Class II Business to Class III Residential.[10]

"2. That prior to City Planning Commission action on the development plan, the owner, Lakewood Homes, Inc., and/or Ben Cogen, should submit a final plat identifying thereon the major elements of the proposed Northwood Apartments project including among other items, the following:

"Building setback lines
"Street right-of-way (public and private)
"Street names if public
"Building locations
"Recreation areas (public or private)

---

[10]The commission very properly rejected this primary planning recommendation of Mr. Kruse. All proposals for rezoning, made after disclosure by the landlord of intent to make use of his property for purposes lawful under the zoning code in effect, are suspect and cannot by reason of Section 1983 be sustained if any nefarious purpose is thereby served—especially where benefits provided by federal legislation would thus be frustrated or where there is any indication that the effect will likely be to perpetuate unconstitutional and unlawful **racial discrimination.**

"Utility easements

"Parking areas

"Parkways (public or private)

"Copies of said plat should be advanced in accordance with the normal plat procedure, and in addition, copies should be provided to all utility agencies by the Development of Planning for their review and official comments.

"3. Specific preliminary recommendations include the following:

"(a) Playground equipment and layout should be specified in appropriate locations.

"(b) The Planning Commission should receive school impact data from the Elida School System.

"(c) Utility easements should be defined and located.

"(d) Building height and exterior views should be made available.

"(e) The southernmost parking lot should be relocated either 25 feet from the south lot line or 12' therefrom with a 4 foot redwood woven fence installed along same.

"(f) The traffic circulation plan is essentially unacceptable as presented. No outlet to Lewis Boulevard should be permitted. Access should be by a loop public street connecting, if possible, Brower Road and North West Street in a manner that would discourage through traffic.

"(g) Pedestrian access to Lewis Boulevard and between the six northernmost buildings and six southernmost buildings should be provided.

"(h) Buffer consideration should be given between the project and the Timmerman Ford property.

"(i) Buffer screening should be provided for the project.

"(j) Outdoor lighting should be provided for the project.

"(k) Utility companies should certify their comments pertaining to easement needs and their capacity to serve the development to the Planning Department.

"(l) Storm drainage data with sufficient outlets should be provided to the City Engineer,

"* * * [Omitted here is text of Resolution 1-68 of Lima City Council, Statement from F. H. A. Publication No. 2504].

"My communication to Mr. Allen of the Federal Housing Administration in Columbus, Ohio, on date May 21, 1968, I have requested additional information regarding the Northwood Apartments, proposed rent supplement project in Lima, Ohio. To date I have not received a reply pertaining to the additional information needed. It is my feeling that the City Planning Commission should, in reviewing the project, be concerned with the project in reference to the F. H. A. statement that it is 'suitable to the market and to the location proposed.'

"The City Planning Commission further should be aware and concerned that (1) the value of the buildings and the character of the property adjacent to the area included in such plan will not be adversely affected; (2) that the plan is consistent with the interest and purpose of the zoning ordinance to promote the public health, safety, convenience and general welfare; (3) that adequate areas for recreation are provided; and (4) that the project is harmonious and pleasing in design.

"PLANNING RECOMMENDATION:

"Due to the fact that additional information regarding rent supplement features of the project has not been received, and a request has been made by the City Planning Commission for a legal opinion, I hereby recommend that the City Planning Commission take this project under consideration that a study session be held to review the rent supplement factors regarding the Northwood Apartment project."

Thereafter on June 26, 1968, Mr. Kruse made a three-page follow-up letter report to the commission as follows:

"Since the preparation of my planning report dated May 22, 1968, I have had the opportunity to review the Drawings for Northwood Apartments dated May 1968 as prepared by Collins & Kronstadt, Leahy, Hogan, and Collins of Silver Spring, Maryland. These plans for

owner, Ben Cogen, with Job Number 6781 thereon were reviewed by the undersigned on date of May 22, 1968, at the close of the City Planning Commission meeting.

"In addition, some additional information concerning the Rent Supplement Program has been received by my office.

"PLANNING REVIEW CONSIDERATIONS:

"*Building Height and Exterior Views*:

"The drawings as submitted for the proposed Northwood Apartments indicate two (2) story apartment buildings of wood frame with brick veneer construction. The apartment buildings are constructed on a concrete slab with a wood truss roof system.

"*Recreation Areas*:

"The drawings show two (2) proposed play areas as noted below:

"Play Area No. 1
"One (1) Sandbox (11' x 12')
"One (1) Climb-About
"One (1) Swing & Slide Set (1 slide, 4 swings)
"Six (6) Benches
"Size: 35' x 45' or 1,575 square feet
"Play Area No. 2
"One (1) Sandbox (17' x 19')
"One (1) Saddle Slide
"One (1) Climber
"One (1) Slide
"One (1) Swing Set (4 swings)
"One (1) See-Saw
"Six (6) Benches
"Size: 35' x 50' or 1,750 square feet.

"Based on the above two play areas as proposed, a total of 3,325 square feet would be designated for recreation. With 200 dwelling units in the project area to be served, the proposed recreation facilities are somewhat inadequate and the space as designated is not fully appropriate in size.

"PLANNING RECOMMENDATIONS:

"The Planning Recommendations as contained in the

Planning Report dated May 22, 1968, still apply to the proposed Northwood Apartments—Development Plan with the following modifications and/or exceptions:

"Recommendation 3. (a) should be amended to read 'More adequate recreation space and facilities should be specified for the apartment project.'

"Recommendation 3. (b) should now be deleted since school impact data has been presented regarding the Elida School system.[n]

"Recommendation 3. (d) This preliminary recommendation should now be deleted since the drawings have identified building heights and exterior views.

---

[n]This 22 page report dated Jan. 25, 1968, was prepared by Roland Swank, Superintendent, Elida Local Schools and was filed with the Lima City Planning Commission.

It shows for the Elida District a total school tax rate of 24.65 mills (19.40 of which is for operating expense), a school of 2268 pupils, and a tax valuation of $13,604 per pupil. This is contrasted with tax values per pupil in other Allen County districts as follows: Shawnee—$31,104; Bath—$24,573; Lima Public—$12,712; and Perry—$10,854.

Total 1968 tax rate in the Elida Local District, including non-school taxes was 34.00 mills, tied with Lima City as the second highest of 10 county areas ranging from a low of 26.80 in Bath to 34.75 in Allen East—Lafayette.

The survey summarizes school growth over 10 years ending with 1967 and projects estimated growth on average of 5 years just past through spring of 1972—indicating a likely increase of 69 pupils per year. The following paragraphs are quoted from the report:

"Vii. Miscellaneous Notes

"* * *

"B. *Student Enrollment Increases.* They seem to have leveled off since 1965. However, large housing developments or a change in the policy of Catholic school attendance could present serious crowding conditions at an early date.

"C. *Need for Additional School Facilities.* 1. It seems apparent that additional facilities will be urgently needed by the fall of 1970. Three (3) sections of grade 6 will need be moved back to the high school building this coming fall.

"* * *

"D. *Financial Data Related to Building Program.* * * * 3. Deducting present bonded indebtedness already incurred ($1,428,000), this would leave an estimated limit of $1,954,000 to be voted in fall of 1969 or spring of 1970."

"Recommendation 3. (h) should be amended to now read 'Some additional buffer consideration should be given between the project and Timmerman Ford property.'

"Recommendation 3. (j) should be amended to now read 'Post and Floodlight outdoor lighting facilities are identified on sheets E 1 & E 2 of the Drawings. All exterior wiring should be underground and all exterior lighting on the applicant's property should be installed so as not to disturb the surrounding neighbors.'

"RENT SUPPLEMENT CONSIDERATIONS:

"The Department of Housing and Urban Development Bulletin—'The Rent Supplement Program—for Low-Income Families' H. U. D. IP-4 dated January 1967 on Page 3 states:

"All rent supplement projects must be of modest design, in order to keep costs down. They must also be suitable for the market and for the location proposed."

The Federal Housing Administration office in Columbus, Ohio, by letter dated April 11, 1968, regarding the Rent Supplement Program stated in part the following:

"(1) Regarding the market—

"An analysis of housing has been made in Lima, Ohio, and it has been determined that approximately 20% of the houses are substandard."

"(2) Regarding the location—

"It is preferable to have a Rent Supplement Project within close proximity to areas from which low-income families would be moving."

"RENT SUPPLEMENTAL OBSERVATIONS:

"With approximately 20% of the houses in Lima, Ohio, classified as being 'substandard' by F. H. A. it follows that there is market for one or more rent supplement projects within Lima, Ohio.

"Since a Rent Supplement Project must be suitable to the location proposed, and it is preferable to have it within close proximity to the areas from which low-income families would be moving, the proposed location is questionable regarding these two points."

At the May 22, 1968, public hearing before the com-

mission, plaintiff's counsel objected to having rent supplement discussed or considered by the commission maintaining that it has nothing "to do as to the type of apartments they're going to be, whether or not these are going to be occupied by persons in the luxury class, middle income, poor income, has absolutely nothing to do with the layout of this project." Thereafter, the commission voted to request a legal opinion from the city's law director. Then appellant waived its previous objection to any discussion of the matter. See Appendices IV and V for full excerpt of proceedings on this issue.

In June 1968, while the City Planning Commission was considering this matter under Section 1303.01 C. O. L. and holding public meetings pursuant to the notice published in the Lima News on April 26, 1969, there is in evidence 61 letters signed by 87 people (counting those signed Mr. and Mrs. as two) concerning this project, which were directed to either the commission or to some city official. Only one, dated May 29, 1969, approved the project. It was from the Community Action Committee for Lima and Allen County (part of the federally promoted anti-poverty program). It reads:

"Please be informed that the Lima and Allen County Community Action Commission went on record at its May 23, 1968, meeting as supporting the apartment building program proposed by Mr. Ben Cogen to be operated under the rent supplement program.

"This is a badly needed program in our area to help in seeing that all Lima residents have decent housing at a cost they can afford.

"To have visited in some of the unsafe and dilapidated structures which are presently rented for $50.00 to $80.00 per month in our area is enough to convince the CAC Board of Directors that something must be done.

"We hereby request that you consider this request by Mr. Cogen."

All the other letters were solidly opposed to the project and listed no less than 154 reasons why, which I have tabulated as follows: (For selected quotations from objectors, see Appendix VIII.)

| Reason for opposition | Number of Times Cited |
|---|---|
| 1. Will raise school tax levies precipitously or result in lowering of present quality of public education. | 37 |
| 2. Will depress general property values. | 34 |
| 3. Location is wrong—many other areas more appropriate. | 25 |
| 4. Will result in influx of lower income people into a higher income community and make everyone—including new arrivals—unhappy. | 18 |
| 5. Cause congestion of traffic and people making community less safe in which to live and requiring more police for unruly people who have declared their defiance of present law. | 13 |
| 6. Will soon cause fine community to become a slum. | 7 |
| 7. Arrival of ''low quality'' residents will cause many present ''high quality'' residents to leave. | 6 |
| 8. Wouldn't have located in present location if not of opinion present zoning was stabilized. | 6 |
| 9. Do nothing for anyone except to enrich Mr. Cogen. | 5 |
| 10. Not compatible with present use of adjacent property. | 3 |
| Total Number of Objections | 154 |

The foregoing has led the court to a consideration of—

BACKGROUND AND SURROUNDING CIRCUMSTANCES

In evaluating this voluminous record the court takes judicial notice of the official U. S. census reports[12] and

[12]The court has recently discovered that the United States appears to be unique in that its fundamental charter of government, its Con-

what is commonly known in Allen County as fact, to say nothing of a number of judicial decisions and facts of political history of our Nation.[13]

stitution, not only provides for the taking of a Census "within three years after the first meeting of the Congress of the United States" but also "within every subsequent term of ten years." The court understands that Massachusetts, in addition, takes a census of the state midway between the occasions of decennial census taking by the National Bureau of the Census.

[13]The court is all too familiar with the facts of the Ohio cases cited in: "A Critique of the Ohio Public Accommodations Law" (1961), 22 O. S. L. J. 201, and "Civil Rights: A New Public Accommodations Law for Ohio" (1961), 22 O. S. L. J. 683, both by William W. Van Alstyne.

E. g., in 1917 *Guy* v. *Amusement Co.*, 7 Ohio App. 509, 28 O. C. A. 231, 30 O. C. D. 77 was decided. Plaintiff and her escort, negroes, were not permitted to remain seated in the center section of a theater because of their color. In a suit against the theater for the penalty a jury ignored the court's charge as to the law and returned a verdict for the defendants. On appeal, the court found that the jury *did not comprehend* the trial judge's correct charge as to the law. Ordinary knowledge of our legal procedure tells us the case must have been about one year old, at least, when it reached the appellate court, at appellant's expense.

In opinion, at pp 515, 516, Judge Louis T. Farr, a former Common Pleas Judge of Columbiana County said, "What are the circumstances of this case? Here was this young theological student and his lady, both persons of good character. Was there any reason why they should be discriminated against? Is it not true that under the provisions of the foregoing sections of the statute they *were* discriminated against? To hold otherwise, would be to render these sections as sounding brass. Said sections were passed by our Legislature not for an imaginary, but a real purpose. A little more consideration, a little more willing obedience to these laws, on the part of the people of the white race might render some of the problems which have arisen a little less perplexing."

But the only remedy the Court of Appeals could grant was a new jury trial.

Nor is the court unmindful of ancient cases such as *Polly Gray* v. *State of Ohio* (1831), 4 Ohio 353. She was indicted for robbery. The only witness against her was a negro. The trial court permitted him to testify and she was convicted. A statute then provided that the testimony of blacks and mulattoes could not be admitted where white persons were a party. It was conceded that Polly was not pure white. The Supreme Court of Ohio in concluding the case said,

"* * * We believe a man, of a race nearer white than a mulatto is admissible as a witness, and should partake in the privileges of whites.

Lima, Ohio, is a city of 51,037 persons (1960 census) of whom 89.5% are white and 10.5% are black. To this date it has no public housing or publicly subsidized housing. Neither has it undergone any program of urban renewal. As the evidence shows it is a modern city operating under a home rule charter.

References to census figures and to easily available local news media show the city to be the county seat of a well to do, largely white populated county with 52,654 persons living in Allen County outside the city of which 3.6% are black, 96.4% white, which computation takes no account of the 51 persons in Allen County who are neither white nor black.

The 1960 census figures according to original township lines from which area for the city has been taken, show the following racial distribution.

|  | White | Negro | Other |
|---|---|---|---|
| American Township | 31,819 | 1,060 | 8 |
| Bath Township | 22,306 | 1,614 | 27 |
| Perry Township | 10,882 | 4,154 | 9 |
| Shawnee Township | 9,179 | 478 | 1 |
| Total | 84,186 | | |
| Less—in city proper | 51,037 | | |
| Living in central townships outside city | 33,148 | | |
| Distributed (estimate) | 30,997 | 2,151 | |

"We are of opinion that a party of such a blood is entitled to the privileges of whites, partly because we are unwilling to extend the disabilities of the statute further than its letter requires, and partly from the difficulty of defining and of ascertaining the degree of duskiness which renders a person liable to such disabilities." Consequently the testimony against Polly was incompetent and her conviction reversed. The court's syllabus succinctly reads, "A negro is not an admissible witness, against a quarteroon, on trial charged with a crime."

And that in 1851, in constitutional convention, it was seriously proposed that the new Ohio Constitution include a provision reading, "And the General Assembly shall, by law, prohibit black or mulatto persons from emigrating into, or becoming residents within the limits of this state." Ohio Convention Debates, 1851-1852, Vol. 2, page 598.

Utilizing published census figures and common local knowledge it appears that roughly 70% (742) of American township negroes live on High Street or south thereof within the city limits; 70% (1,130) of Bath Township negroes live in the Garfield area bounded on the north by Flanders Street, on the east by the Ottawa River, on the south by Eureka Street and on the west by Main Street; 70% (2,907) of Perry Township negroes in that part of the city amounting to about two square miles from the northwest corner of Perry Township; and that 60% (287) of Shawnee Township's black people live within less than one square mile in its northeast corner which is within the city limits.

Racial distribution (1960) in the remaining townships is as follows:

| | White | Negro | Other |
|---|---|---|---|
| Amanda Township | 1,217 | - | - |
| Auglaize Township | 2,303 | - | - |
| Jackson Township | 1,999 | - | - |
| Marion Township (includes Delphos City) | 5,937 | - | 1 |
| Monroe Township | 1,950 | 2 | - |
| Richland Township (Bluffton Village) | 4,618 | 13 | 4 |
| Spencer Township (Spencerville Village) | 2,942 | 1 | 1 |
| Sugar Creek Township | 1,166 | - | - |
| | 22,132 | 16 | 6 |

Not the slightest evidence was introduced that a single one of the 700 houses built by Ben C. Cogen in the 25 years preceding January 1, 1968, and practically all of which were built within a one-mile radius of the site of instant 13.6 acre tract was sold to or occupied by a negro and,

if any, the court must assume such sale or occupancy to be of the merest token variety in light of known facts.[14] In short, the immediate area of the problem is what, I take it, most journalists would denominate a solid, white, middle class or upper-middle class community, the residential areas of which have been chiefly confined to single family dwelling units.[15] Moreover, Allen County is bounded by the counties of Putnam, Hancock (in which is located the city of Findlay with a population of 30,344, only 0.6% of which are black), Hardin, Auglaize and Van Wert. Also, Mercer County nearly touches it.

The writer of this opinion, of no known African ancestry, was born in one of these surrounding counties and raised up in another throughout the first 25 years of his life and is well aware that the last 5 regular census figures for mentioned counties show the following population— with negro population expressed as a percentage of the whole, as follows:

---

[14]"Special difficulties which Negroes have encountered in respect to housing are discussed in "The American Negro Reference Book," editor John P. Davis, 1966, Prentice-Hall, Inc., Englewood Cliffs, N. J., e. g. at page 345 we find:

"Out of the 3.7 million nonwhite families who moved between 1950 and 1960 only 23 percent moved into units built during that decade. By contrast, out of 19 million white families, 58 percent moved into a house or apartment built between 1950 and 1960.

"Thus 'negro districts' commonly are in the slum areas adjacent to the central business and older sections of the city abandoned by the white population. This concentration of negro families in central cities reflects not only economic necessity but also the lack of open occupancy in suburban housing."

[15]The Ohio Legislative Service Commission Report of February, 1969, entitled: 'Staff Research Report No. 97 on Substandard Housing and Report of the Committee to Study Substandard Housing," at pp. 25-26, tells us that:

"* * * Only about half as many Ohio communities have adopted housing codes as have building codes for one, two and three family dwellings * * *. An example of a community where attempts to inaugurate programs have foundered is Lima, where the housing code question has been on the ballot three times since 1960—and has been defeated each time."

U. S. Census Figures For Years Shown

Followed by Non-White Percentage Figures
(99% plus are Negro)

| Ohio County | 1920 | 1930 | 1940 |
|---|---|---|---|
| Allen | 68,223/2.1% | 69,419/2.4% | 73,303/2.6% |
| Auglaize | 29,527/0.1% | 28,034/0.2% | 28,027/0.1% |
| Hancock | 38,394/0.7% | 40,404/0.7% | 40,783/0.5% |
| Hardin | 29,167/1.2% | 27,635/1.3% | 27,061/1.2% |
| Mercer | 26,872/0.3% | 25,096/0.2% | 26,256/0.1% |
| Putnam | 27,751/0.1% | 25,074/ - % | 25,016/ - % |
| Van Wert | 28,210/0.9% | 26,273/0.6% | 26,759/0.5% |

| | 1950 | 1960 |
|---|---|---|
| Allen | 88,183/5.0% | 103,691/7.1% |
| Auglaize | 30,637/0.1% | 36,147/0.2% |
| Hancock | 44,280/0.8% | 53,686/0.5% |
| Hardin | 28,673/0.8% | 29,633/0.7% |
| Mercer | 28,311/0.1% | 32,559/ - % |
| Putnam | 25,248/ - % | 28,331/ - % |
| Van Wert | 26,971/0.4% | 28,840/0.3% |

Note: The figures in this table are taken from or computed from data found in official publications of the U. S. Bureau of the Census.

The summary of the official report (1968) of the National Advisory Commission on Civil Disorders (journalistically, the Kerner Report) prepared by:

Otto Kerner, white, Governor of Illinois, Chairman;

John V. Lindsay, white, Mayor of New York, Vice Chairman;

Fred R. Harris, white, Senator from Oklahoma;

Edward W. Brooke, black, Senator from Massachusetts;

James C. Corman, white, Member of Congress, 22d District California;

William M. McCullough, white, Member of Congress, 4th Dist. of Ohio;

I. W. Abel, white, President of United Steelworkers of America;

Charles B. Thornton, white, Chairman of the Board, Litton Industries;

Roy Wilkins, black, Executive Director, National Association for the Advancement of Colored People;

Katherine Grahem Peden, white, Commerce Commission of Kentucky and

Herbert Jenkins, white, Chief of Police, Atlanta, Georgia, shows that "almost all negro population growth (98 per cent from 1950 to 1966) is occurring within metropolitan areas, primarily within central cities." And a footnote tells us that "A 'central city' is the largest city of a standard metropolitan statistical area, that is, a metropolitan area containing at least one city of 50,000 or more 'inhabitants.' " So, whether most of its citizens want it to be or not, Lima is now a central city. Although no evidence on the point was adduced, the court will assume from known facts that in all likelihood, a disproportionate amount of this "substandard" housing presently houses black people in the southern area of the city, particularly wards 5 and 6.

Moreover, in the interest of establishing as much of the whole truth as can be, the court notes that, in connection with the matters litigated that although Lima's Chief of Police is a negro, neither the Mayor nor any member of City Council, any member of the City Planning Commission, Board of Adjustment, except Ted Wilson, City Planner, or any member of counsel in this case, is a person of color. At the hearing of this appeal requiring two full days, there were always from 12 to 20 spectators, all white, in appearance, except during the forenoon of the second day there was among the spectators one young negro. All were quiet and well behaved in court.

In view of the foregoing there can be no doubt that at present *de facto* housing segregation exists in Lima and Allen County. As was held by Judge Austin in *Gautreaux* v. *Chicago Housing Authority* (10 Feb. 1969), 296 F. Supp. 907, it must be clear to all with clear perception that this pattern has chiefly resulted because of usage (a uniform

practice) of the dominant white majority in discriminating generally against negroes in the sale and rental of housing, and definitely contrary to the words of Section 1982. True it has been held for decades that said sections did not apply to prohibit private discrimination in this field as in other areas of human conduct—only to prohibit official state action contrary to the 14th Amendment.

But mentioned sections have never been repealed by Congress and have now been newly interpreted by the Supreme Court in which our Constitution vests the nation's judicial power. As *Gautreaux* discloses, the Aldermen of Chicago (comparable to members of city council here) made site locations of public housing facilities on a racial basis by the exercise of a veto through the usage of "Alderman's courtesy." Akin to senatorial courtesy when in certain areas a senator finds something personally objectionable all join his ranks as a mesaure protective of the institution. Such action on the part of municipal officials is now declared to be clearly illegal and in fact all city officials involved are now declared, in Chicago, to have the duty of making new site locations in areas where the old segregated housing pattern will not be either enhanced or perpetuated. It is clear to me that these same provisions and principles of law apply to not only Chicago but to the entire United States including Allen County and the whole state of Ohio.

This case differs from *Gautreaux* in that it does not involve a public housing agency charged with providing low rent housing.

It concerns the right of a free white citizen land owner who wishes to provide modern private housing (part of which will accommodate those of moderate and low income, as by Congress and H. U. D. provided) by utilizing benefits available to such housing owners under the Housing and Urban Development Act of 1965, as amended (which includes the highly controversial Rent Supplement Act), in full or substantial compliance with Lima's zoning ordinances.

In view of the foregoing I must now make—

An Evaluation of Present Applicable Law

If 42 U. S. Code, Section 1982 is a valid exercise of legislative power by Congress acting under the authority of Section 5, Amendment XIV, U. S. Constitution; and it is a fact that in *Jones* v. *Alfred H. Mayer Co.* (1968), 392 U. S. 409, 20 L. Ed. 2d 1189, 88 S. Ct. 2186, the Supreme Court of the United States declared that the enactment of Section 1982, Title 42, U. S. Code, was a valid exercise of power by Congress authorized by Section 5, Amendment XIV, U. S. Constitution, and the fact that it had lain partially dormant for many years in no way diminished its present force—it must be determined if Section 1983 of the same Title is also in full force and effect.

Section 1982 was a part of the Civil Rights Act of April 9, 1866, passed after adoption of Amendment XIII, U. S. Constitution. It was re-enacted in 1870 after Amendment XIV had been adopted in 1868, along with Section 1983, which made its first appearance in 1870. As previously mentioned, Section 1982 reads, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by *white citizens thereof* to inherit, purchase, lease, sell, hold and convey real and personal property." (Emphasis supplied.) As a result, a decision of the United States District Court for the Eastern District of Missouri dismissing plaintiff's action for injunctive relief because of defendant's refusal to sell a home in a private subdivision to plaintiff solely because of race was reversed. The Supreme Court also held that the fact that the statute governing property rights of citizens is couched in declaratory terms and provides no explicit method of enforcement does not prevent federal courts from fashioning an effective equitable remedy.[16] Nor did

---

[16]See footnote 13 to *Jones* v. *Alfred H. Mayer Co., supra.* I have been unable to find anything that precludes or prohibits state courts in common law jurisdiction from fashioning equitable remedies in respect to matters before them. In fact, I note that courts of the original 13 colonies, before adoption of the Constitution of the United States, commonly exercised equity jurisdiction. Why Mr. Justice Stewart's note 13 failed to note Section 1983's command to entertain an "action at law, suit in equity, or other proper proceeding" for impairment of Civil Rights I do not know.

the court stop here, it ruled that Amendment XIII, U. S. Constitution is not a mere prohibition of state laws establishing or upholding slavery but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States and that Congress is given power to remove every badge of such prior status.

If this is so, then I cannot escape the implication that the present force of Section 1983, Title 42, U. S. Code, is also a valid exercise of the power of Congress and also has a present undiminished force. Section 1983 (a part of the Act of April 20, 1871, c. 22, 1, 17 Stat. 13—R. S. 1979) reads: *"Every person who, under color of any statute,* ordinance, regulation, *custom* or *usage* of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in *an action at law, suit in equity, or other proper proceeding* for redress."

This court exercises general equity jurisdiction and certainly has power to exercise it in this "appeal from the decision of an agency of a political subdivision." Consequently, I believe it can be fairly deduced that this *Jones case* firmly supplants the majority opinion of the Supreme Court of Ohio in *Fletcher* v. *Coney Island* (1956), 165 Ohio St. 150, and reveals that in respect to personal civil rights the correct rule was stated by Judge Hart for the dissenters in said cause.[17]

For it is clear that the U. S. Constitution and valid

---

[17]This *Coney Island case* has puzzled me greatly, especially in view of *City of Akron* v. *Chapman* (1953), 160 Ohio St. 382, 116 N. E. 2d 697, 42 A. L. R. 2d 1140, 52 Ohio Op. 242, where a unanimous Ohio Supreme Court approved Par. 2 of the syllabus reading:

"2. The right to continue to use one's property in a lawful business and in a manner which does not constitute a nuisance and which was lawful at the time such business was established is within the protection of Section 1, Article XIV, Amendments, United States Constitution, and Section 16, Article I of the Ohio Constitution, providing that no person shall be deprived of life, liberty or *property* without due process of law."

acts of Congress and treaties with other nations constitute the supreme law of the land which every one in my position has taken a most solemn oath to uphold. See Clause 2, Article VI, U. S. Constitution.

This case brings into sharp focus the civil rights of the plaintiff, the objecting neighbors, plaintiff's prospective tenants, and all the citizens—including white ones—that propose to make Northwood Apartments a reality, or to prevent it becoming so.

Here it seems entirely probable that if the usage common in the past persists, and if the law of nondiscrimination is proclaimed and interpreted in absolute terms of grammatical logic, major fears of the objectors to this project may quite possibly come true and in about five years we will have one more blighted area in Lima. I can think of nothing Lima or Allen County needs less.

By reason of the foregoing, I perceive a special need for all parties to be told what the law is in a way which all can understand. Moreover, from such understanding it must be clear to Mr. Cogen that he has a fair chance to succeed economically if he complies with it, taking people as they are and not as many might imagine they should be.

Moreover, the neighbors must be told that their old usage (uniform practice) of private discrimination in the field of the sale and lease of real estate is now positively contrary to federal law. They must also understand that maintaining their present objections in respect to this project (although it will deprive some black and some poor persons of housing benefits) will no doubt deprive, in whole numbers, many more of their own moderate income white people.[18] Also, if Sections 1981, 1982 and 1983 are correctly

---

On December 15, 1969 the Supreme Court of the United States reaffirmed its declaration in *Jones* that Section 1982 is presently in full force and effect. See *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 90 S. Ct. 400, 24 L. Ed. 2d 386. The opinion of the court by Mr. Justice Douglas avoids, as did Mr. Justice Stewart in *Jones*, any mention or discussion of Section 1983. Moreover, it was not mentioned by the three dissenting justices.

[18]For example, Judge Austin in *Gautreaux* observed in respect to the area of the city of Chicago (with a 1960 Census total racial dis-

understood, the consequences of future discrimination must be clear not only to the neighbors but to city officials, to attorneys, to realtors and to financial lending institutions. Finally, if Sections 1981, 1982 and 1983 are in the future observed, there will be no real depreciation in the value of objector's homes because primarily chance alone will henceforth determine whether any white person will have a black neighbor tomorrow, or vice versa.

Having thoroughly examined a wide range of legal writing on this subject,[19] some studies indicating a contri-

tribution of 3,550,404 persons: 76.4% white; 22.9% black; and 0.7% other) 296 F. Supp. 907, at page 915:

"* * * First as Dr. Bacon's Affidavit discloses, the 188,000 white families eligible for public housing have understandably chosen in the main to forego their opportunity to obtain low cost housing rather than to move into all Negro projects in all Negro neighborhoods. This is an ironic but predictable result of a segregationist policy of protecting Whites from less than half as many (76,000) eligible Negro families. Second, existing patterns of racial separation must be reversed if there is to be a chance of adverting the desperately intensifying division of White and Negroes in Chicago * * *."

Note: It may also be significant that a computation from the Cook County, Illinois Census data for 1960 shows a black/white and other racial distribution as follows:

|  | Total Population | Black | White and Other |
|---|---|---|---|
| City of Chicago | 3,550,405 | 813,043 | 2,737,362 |
| County Outside City | 1,579,321 | 48,751 | 1,530,570 |
| Cook County Total | 5,129,726 | 861,794 | 4,267,932 |

[19]"The Benevolent Housing Quota" (1960) by Victor S. Navasky, 6 Howard L. J. 30.

"The Case of the Checkerboard Ordinance: An Experiment in Race Relations" (1962) by Boris I. Bitker, 71 Yale L. J. 1387 (Reporting the ficticious Circuit Court case of Jones & Smith v. Town of New Harmony).

"Shelley v. Kraemer: Notes for a Revised Opinion" (1962), by Louis Henkin, 110 U. of Pa. L. Rev. 473.

"The Benign Quota, Equal Protection and 'The Rule in Shelley's Case'" (1963) by William E. Hellerstein, 17 Rutgers L. Rev. 531.

"Equal Justice in an Unequal World: Equality for the Negro—The Problem of Special Treatment" (1966) by John Kaplan, 61 Northwestern U. L. Rev. 363.

"Racial and Economic Segregation by Zoning: Death Knell for Home Rule?" (1969) by Frank A. Aloi, Arthur Abba Goldberg, and James M. White, 1 U. of Toledo L. Rev. 65.

bution by housing deficiency toward disorder,[20] current news and magazine comment,[21] to say nothing of a host of precedents of the United States Supreme Court and other courts, and concurring with Mr. Justice Holmes that "The life of the law has not been logic, it has been experience," and with Mr. Justice Brandeis that "If we would guide by the light of reason, we must let our minds be bold," I have reached a conclusion that a census rule of threes and thirds, complemented by a rule of indiscriminate chance, may be adopted by plaintiff in the initial rental of the apartments he proposes to build and be adhered to by him for 21 years and be held during all that time to be nondiscriminatory in practical effect and lawful under the U. S. Constitution and present federal and state laws.

The rule is that as to any housing unit arrangements or other compact residential area, wherein not less than 100 families are sheltered within any one square mile area, any housing owner (or sponsor) who proposes to build or rebuild using some funds provided by a public treasury may look at the last published census figures, in any county wherein the total nonwhite population does not exceed twice

"Developments in the Law of Equal Protection" (1969), 82 Harvard L. Rev. 1065 (particularly the discussion on Benign Racial Classification, pp. 1104-1131).

[20]In the *Kerner report, supra*, at pp. 149-150, we find "Chart II. Weighted Comparison of Grievance Categories" and that of 12 areas of grievances among the black people in the cities experiencing Civil Disorder in 1967, third on the list was "Housing," close after "Police Practices" and "Unemployment."

[21]The court is not at all unmindful of factual journalistic reports such as "Report from Black America," Newsweek, June 30, 1969, pp. 16-35.

Or of hopeful progress reports such as "How Women Answer the Ten Hardest Race Questions," by Lois Mark Statvey, Women's Day, June, 1969, pp. 28 et seq.

Nor of current newspaper accounts such as "Romney's Doubters: Many in Housing Industry Are Skeptical 'Operation Break Through' Can Meet Goals" by Monroe W. Karmin, Wall Street Journal, August 21, 1969, at p. 24.

"Huge Housing Crisis Moving Across U. S.", (AP) Columbus Dispatch, Oct. 12, 1969, at p. 9 A.

"Director of Model Cities Pledges Nonintervention in Local Decision," (UPI) Columbus Dispatch, October 14, 1969, at p. 23 B.

the national average percentage of such population, in which the proposed construction is to be located and observe the percentage of residents of any minority groups, here in particular negroes (it clearly appearing to all that they have been for the longest time the chief victim of invidious discrimination). For example, the 1960 census for Allen County shows the population to consist of 51 persons who are neither white nor black, 7,358 black persons, and 96,282 white people—a total of 103,691.

So, if appellant will initially allocate rental of his units as follows, I hold it will be done equitably and enforcible as a matter of equity under Section 1983—to say nothing of the fact that I perceive it to be in accord with general equitable principles (here I include the 51 persons who are neither white nor black along with the whites as I have no reason to suspect they suffer any invidious local discrimination by reason of any uniform practice of the vast majority in Allen County).

Seeing then that the population percentage of negroes in Allen County is .0711 we round it off at the next full percent of 8. So 8 per cent of the units must be allocated for black tenants (if there are such applicants) who must not be crowded into any one building, where a number of buildings containing multiple units are erected as is here proposed.

Multiplying 8% by three and subtracting from 100% gives us 76% of the units which can be allocated for white tenants who also may not choose single buildings wherein no black people reside.

Now adding mentioned 8% and 76% equal 84%, which, subtracted from 100%, leaves 16% to be assigned as follows (assuming there are both more white and black applicants than there will be available units): For a period of at least 30 days before possession can be granted appellant must accept the applications of all "qualified tenants" whether of independent means or as defined by H. U. D., and then operating an open and true game of chance, lease to those who draw the lucky numbers.

With respect to filling later vacancies, appellant may during the first 21 years, maintain, if he desires, a rental

quota wherein at least 8% of the units are negro occupied and 76% are white occupied with fluctuations among the remaining 16% in accord with any fair rental policy appellant may formulate. Moreover, the equity commanded by Section 1983 requires that he may have, if he requests, a declaratory judgment, good for at least 21 years, determining whether or not a rental policy, if uniformly adhered to, will be a fair and equitable one under our laws and constitutions, for I perceive that anything truly called a rule of law in our modern urban society demands it. The foregoing presumes that among the qualified applicants at least 8% will be black, and there will probably be more such applicants. Of course, if after fair public notice, less than 8% of the applicants are black, appellant may fill the vacancies with other applicants. As to future vacancies during the first 21 years, preference must be given to Negro applicants as per the rule announced until the basic percentage, increased by one-third, is attained as a minimum.

Should the official publication of the 1970 census show an increase in Negro population to 9%, then, until the next such publication, appellant would have to provide at least 9% units to be occupied by black people and 73% by white people with the rest being rented in accordance with the owner's published fair rental policy. So for 10 years at a time, appellant can thus manage his apartments if he so desires, and particularly if he deems it necessary to economic success.[22]

Now, as Judge Austin in *Gautreaux* observed, the present situation (wherein nearly ¾ of the county's black people reside in four areas comprising perhaps a little more than 1 square mile of the county's 410) must presumptively have come about because the result of invidious discrimination against black people, except perhaps in a few special instances. By reference to the census figures and common knowledge in the vicinity, I hold that a pre-

---

[22]In *Gautreaux* it is true that quotas were held to be unlawful and certainly I would concur as to any inflexible and nearly perpetual one. The possibility, however, of an equitable quota for a term of years and based upon census facts within a limited area such as a county, was not discussed.

sumption arises in any area of one square mile or lesser area of not less than 100 family residences, where less than 1/3 of the total percentage of Negroes in the county raised to the next full percent (here 3%) are not occupied by black people, *every sale is presumptively invalid* unless countervailing evidence of a clear and convincing nature to the contrary is adduced.

Also that in any county wherein the last census shows that less than 3% of the population constitute any minority group recognized as the object of widespread invidious discrimination on the basis of ancestry or religion a like presumption arises in every area of the county not already accommodating at least 1% of such group.

I hold further that whenever three times the percentage of Negroes as per the last census (or in specific counties any other ethnic minority widely recognized as a victim of invidious discrimination) exceeds 50%, an individual owner may maintain 50% of his units for white occupancy so long as white people, on a national scale, continue to constitute an overwhelming percentage of the total national population.

Nor do I forget any of the people the Rent Supplement Act proposes to help. Again, I do not propose to tell appellant what to do but I hold that he may, if he desires or as a matter of economic management, in respect to any class the Act proposes to benefit, be held not to unlawfully discriminate if he refuses to accommodate on this basis after a full percentage of such persons in the county, increased by one-third, are already accommodated. For example, the percentage of persons over 62 in Allen County reported by the last census is .075. So .075 plus .025 equals 10%. If 10% of the units are occupied by such persons, new qualified applicants may be refused on the basis of age.

In Section 1701s (h), Title 12, U. S. Code, providing *"Additional definition of housing owner; restriction on payments"* it is stated that with respect to properties financed with loans under Section 1701g made on or before August 10, 1965, "payments shall not be made with respect to more than 20 per centum of the dwelling units in any property so financed"—and similarly as to those assisted at any time under Section 1715z - 1 of this title (12).

In considering this 20% limitation figure in the statute, I must suspect it was a practical provision designed to foster the efforts of private enterprise and provide wider occasion and example for people who truly want better and nicer places in which to live and are willing to abide by the discipline necessary to provide and maintain them. So, if and when the owner is accommodating qualified tenants who receive rent supplements to the extent that their total numbers equal one third of his units he may refuse—though he is not required to—to accept more such unless they move into units vacated by persons whose rent is supplemented by the government. Here this means he may, at time of any lease, refuse to rent to statutory "qualified tenants" if he is already renting 67 units of the 200 to such persons. It now appears doubtful that appropriations by Congress will provide for 20% of the tenants but as to projects begun now, I hold it would be inequitable for H. U. D., during the next 21 years, to compel subsidized occupancy in excess of this figure.[23]

[23]This court recognizes that in the absence of Congressional permission it has no power to require H. U. D. to comply with this conclusion, but such fact in no way prevents this court from declaring what, in these circumstances, is inequitable. As Judge Body points out in footnote 5 of his opinion in *Powelton Civic Home Owners Assn.* v. *H. U. D.* (1968), 284 F. Supp. 809, 819-20, in respect to complaints that officers of that agency had not complied with procedures required by law. "* * * no remedy other than federal judicial review could be considered either adequate or appropriate." Of course I do not think Congress is without power to provide judicial review by state courts of competent jurisdiction, if it deems the same advisable. Congress already has mentioned the effect of some aspects of local responsibility and action, viz:

"42 U. S. Code, Section 1451 *Local programs—Local Responsibilities considered by Secretary in extending financial assistance*

"(a) In entering into any contract for advances for surveys, plans, and other preliminary work for projects under this subchapter or for grants pursuant to Section 1453 (d) of this title, the Secretary shall give consideration to the extent to which appropriate local public bodies have undertaken positive programs (through the adoption, modernization, administration, and enforcement of housing, zoning, building and other local laws, codes and regulations relating to land use and adequate standards of health, sanitation and safety for buildings, including the use and occupancy of dwellings) for (1) preventing the

I cannot regard the situation here lightly—and although the days have been few indeed, since March 17, 1969, when I have not given some thought, study or dis-

spread or recurrence in the community of slums and blighted areas, and (2) encouraging housing costs reductions through the use of appropriate new materials, techniques, and methods in land and residential planning, design, and construction, the increase of efficiency in residential construction, and the elimination of restrictive practice which unnecessarily increase housing costs.

*"Encouragement of operations of local public agencies*

"(b) In the administration of this subchapter, the secretary shall encourage the operations of such local public agencies as are established on a State, or regional (within a State), or unified metropolitan basis or as are established on such other basis as permits such agencies to contribute effectively toward the solution of community development or redevelopment problems on a State, or regional (within a State), or unified metropolitan basis. The Secretary shall particularly encourage the utilization of local public agencies established by the states to operate on a statewide basis in behalf of smaller communities within the state which are undertaking or propose to undertake urban renewal programs whenever that arrangement facilitates the undertaking of an urban renewal program by any such community, or provides an effective solution community development or redevelopment problems in such communities, and is approved by resolution or ordinance of the governing bodies of the affected communities.

"* * *

*"Facilities for furnishing urban renewal service and assembly of information*

"(d) The secretary is authorized to establish facilities (1) for furnishing to communities, at their request, an urban renewal service to assist them in the preparation of a workable program as referred to in subsection (c) of this section and to provide them with technical and professional assistance for planning and developing local urban renewal programs (including rehabilitation projects requiring no additional assistance under this subchapter or self liquidating redevelopment projects), and (2) for the assembly, analysis and reporting of information pertaining to such programs.

*"Workable program requirements*

"(e) No loan or grant contract may be entered into by the administrator for an urban renewal project unless he determines that (1) the workable program for community improvement presented by the locality pursuant to subsection (c) of this section is of sufficient scope and content to furnish a basis for evaluation of the need for the urban renewal project; and (2) such project is in accord with the program."

Aug. 1, 1968, Pub. L. 90-448, Title V, Section 513, 82 Stat. 525

cussion to aspects of this case, it was early October before I arrived at a general conclusion which I deemed to be theoretically sound and providing practical answers to appellant so he can have a fair chance to succeed in building needed apartment houses now and in the future—and so that like-minded men of ability might be able to do likewise anywhere in Ohio—and perhaps in the Nation. Nor am I at all satisfied that my solution is perfect—or the best—but it is the best I have been able to devise within a reasonable time in addition to other demands made upon me.

I would have a strong suspicion—in the absence of countervailing evidence of a clear and convincing nature—that the provision in C. O. L. 1303.01 requiring development plan approval by both the City Planning Commission and the City Council provide, in part, a procedure to—

(1) facilitate (by amending ordinances) projects desired and approved by both the Commission and the Council; and

(2) veto projects not desired by either the Commission or Council much as Chicago Aldermen have for years vetoed projects whose locations they disapproved—a practice now definitely illegal because unconstitutional if to perpetuate racial segregation.

For the benefit of appellant and all who are victims of the discrimination forbidden by Sections 1981 and 1982 and any usage contrary to Section 1983, I have held that in any one square mile of area in any county, or lesser area consisting of at least 100 residences, where the residences occupied by negroes percentagewise, house fewer in number than 1/3 of their total percentage of population, every sale or lease of housing accommodations is presumptively made pursuant to local discriminatory usage and that such sales may not be lawfully facilitated by either owners, licensed real estate agents or established lending agencies. For any discriminatory sale in such area appellant (if he is complying with the requirements of law pertaining to his project) or any victim of legal discriminatory usage may enjoin such sale if not consummated or recover as damages the difference between actual

sale price and any higher price at which it may have been offered but not sold to a person of color, together with all costs, and as against realtors and finance agencies who profit by such transactions, recover all commission received together with such reasonable attorney fee as is necessary to recover same.

I hold that Section 1983 authorizes this in any court exercising general equity powers and that such provision is necessary to practical, effective results. Moreover, under Section 1983, appellants have their choice of remedy other than suits in equity. Also, this particular appeal is an "other proper proceeding" wherein the rights therein specified must be vindicated.

Appellant here has standing to be a party in this respect because unless he can be freed from the usage common in the past the market value of his own project will necessarily decline with excess rapidity.[24] Of course all victims or prospective victims of housing discrimination based *solely* on race have standing to assert their rights as against anyone who has not previously done his part as I have adjudged appellant will have if he maintains a minimum equitable or benign quota for 21 years.[25]

---

[24] As Sir Alan Herbert put this idea in the reference noted at (FN 31):

"And it has to be conceded that you can't go very far,
Towards a definite objective if you don't know where you are."

[25] *Ranjel* v. *City of Lansing* (1969) (U. S. D. C.—W. D. Mich.) 293 F. Supp. 301, holds that all those threatened with discriminatory deprivation of their rights may be parties and establish such fact in court.

Moreover, the court held that referendum submitted to a vote of local electors cannot be utilized to deprive persons of their civil rights who are either victims of discrimination or the threat thereof.

At page 304, Judge Fox says:

"Working through the Lansing Housing Commission, the city of Lansing and HUD selected Jolly Cedar, a twenty acre parcel located in a white neighborhood in the southern portion of the city, as one of the sites. A major factor in site selection was compliance with Title VI of the Civil Rights Act of 1964, 42 U. S. Code, Section 2000d, and Regulations of HUD pursuant to Title VI, particularly 24 C. F. R., Section 1.4 (b) and Section 205.1 (g) of the HUD Low Rent Housing Manual (Exhibit 1), which require that sites be selected outside

All areas and particularly new development areas of any kind must prove they have *had* no minority race applicants unless they are accommodating a percentage of such minority equal to one-third of the county's last census figure. I make this rule because I am unable to see any solution feasible in the foreseeable future for eliminating so-called "economic segregation"—and probably, considering the claims of freedom, the possibility of "upward" mobility is all that should for some decades concern us.

Also, I hold that financial institutions lending to real estate purchasers can protect themselves by requiring sworn affidavits of fact from sellers and their brokers that in any particular sale affiants have not violated either Section 1982, Title 42, U. S. Code, Health and Welfare; and/or Section 4112.02 (H) (9), Revised Code of Ohio. If the managers of such institutions have reason to suspect that their affiants might not be telling the truth, I have no doubt they can require an indemnifying agreement that should the affidavits prove false they will save harmless the lending agency as a part of the consideration for making the loan. And true equity will certainly closely scrutinize all sales anywhere in the county during the next 10 years made to white persons now living within one mile of this project.

*Bush* v. *Kaim* (Feb. 5, 1959), 297 F. Supp. 151, 17 Ohio Misc. 259, decided by United States District Court Judge Lambros, formerly an Ohio Common Pleas Judge, has already applied in Ohio 42 U. S. Code, Section 1982, as now in full effect to nullify a private discrimination, based on race, in the rental of housing with a ruling that the issuance of an injunction based on equitable principles was necessary to provide an acceptable remedy for denial of Section 1982 rights.

And if Section 1982, Title 42, U. S. Code, Health and Welfare, is today a thoroughly effective statute, I am un-

---

areas of racial concentration. There were also other reasons for selection of Jolly Cedar: children of black and Mexican-American families would be able to attend predominantly white schools; the site would provide easy access to employment opportunities, transportation, shopping and health facilities; and most future development would occur in this part of the city."

able, I repeat, to see why Section 1983, Title 42, U. S. Code is not equally effective by virtue of Clause 2, Article VI, U. S. Constitution, the supreme law of the land which I am bound to uphold, even if the Ohio Legislature had not enacted Section 2506.04, Revised Code, or Section 4112.02 (H) (9), Revised Code. This latter section, known as the "anti-blockbusting statute" effective October 30, 1965, I find, is hardly known. Perhaps this is so because the procedure in respect to violations is so cumbersome and time consuming before leading to mild practical results I would expect many victims would think it not worth making complaint.[26]

Consequently, in the exercise of its full equity powers, which I perceive this court has by virtue of a true delegation thereof by the state Legislature in Section 2506.04, Revised Code, and in this type of case particularly, by virtue of the command of Congress in Sections 1981, 1982 and 1983, Title 42, U. S. Code, Health and Welfare, so that had

---

[26]Effective October 30, 1965, our Ohio Legislature last amended Section 4112.02 of the Revised Code, *Unlawful discriminatory practices*. The "Anti-Block Busting Provisions" of the section read:

"It shall be an unlawful discriminatory practice * * *

"(H) For any person to: * * *

"(9) Induce or solicit or attempt to induce or solicit a commercial housing or personal residence listing, sale, or transaction by representing that a change has occurred or may occur with respect to the racial, religious, or ethnic composition of the block, neighborhood, or area in which the property is located, or induce or solicit or attempt to induce or solicit such sale or listing by representing that the presence or anticipated presence of persons of any race, color, religion, ancestry or national origin, in the area will or may have results such as the following:

"(a) The lowering of property values;

"(b) A change in the racial, religious or ethnic composition of the block, neighborhood or area in which the property is located;

"(c) An increase in criminal or anti-social behavior in the area;

"(d) A decline in the quality of the schools serving the area.

"No person shall discourage or attempt to discourage the purchase by a prospective purchaser of a commercial housing or a personal residence by representing that any block, neighborhood, or area has or might undergo a change with respect to the religious, racial, or nationality composition of the block, neighborhood or area.

"* * *"

appellant brought action for either injunction or declara-
tory judgment, this court has authority, when public offi-
cials fail to act equitably under applicable law, to do what
true equity has always done, *i. e.*, do what ought to be done
considering the whole of the circumstances and consider-
ing that equity is the mitigating principle in the law,[27] that
"equity delights to do justice, and not by halves,"[28] that
equity does not suffer a wrong to be without a remedy,[29]
and that equity is that aspect of the law which has ever
refused to define words such as fraud, "lest the craft of
man evade the definition."[30]

In my consideration of this case, I have not forgotten,
I hope, the civil rights of anyone. Not the appellant, nor
the appellees (city officials or neighbors), nor the prospec-
tive beneficiaries of the Rent Supplement Act—not even
those of every citizen whose taxes are to make some con-
tribution towards projects such as these.

I start with the appellant. He is a white man and a
successful builder of substantial individual homes. It is
certainly a fair inference that all the objectors were able
to have the comfortable and attractive homes they have
because neither they nor appellant were denied any civil
right guaranteed them not only by the law of Ohio or Acts
of Congress, but by the usage (the universal practice) all

[27] See 20 Ohio Jurisprudence 2d 16, Section 2, Equity. All great
systems of jurisprudence have a mitigating principle, or set of prin-
ciples, by the application of which substantial justice may be attained
in particular cases wherein the prescribed or customary forms of the
ordinary law seem to fall short of reaching their goal. * * *"

[28] *State, ex rel. Edmundson*, v. *Bd. of Education* (1964), 2 Ohio Misc.
137, 147; 201 N. E. 2d 729, 736.

[29] See 20 Ohio Jurisprudence 2d 38, Section 13, Equity. "The very
nature of equity makes it adaptable to new conditions. A court of
equity is not or should not be, prevented from exercising its jurisdiction
in accordance with its established principles, by the mere novelty of
the facts presented in a given case. To adapt these principles, and to
mold and apply its elastic remedies to new situations arising out of in-
creasingly complex and constantly changing social relations, are of the
very genius of equity. * * *"

[30] *Crouch, J.*, in *Shonfeld* v. *Shonfeld* (1933), 260 N. Y. 477, 184
N. E. 60, citing Lord Hardwicke, Chancellor (1745), in *Lawley* v.
*Hooper*, 3 Atkyns (Eng.) 278.

city officials exercised in respect to them as the Codified Ordinances of Lima were administered when the permits to build the houses they occupy were issued.

Now appellant proposes to exercise the right of private property over his own for a purpose specified in the Zoning Code since at least 1964 and proceedings are had under the same Codified Ordinances and there is an uproar of protest such that in the minutes of the City Planning Commission for June 26, 1968, a member stated (some 8 weeks after notice of the public hearing in respect thereto was published) "to date he had received *no* correspondence from anybody in favor of the plan." And of the more than five dozen letters concerning the project and directed to city officials—only one favored it. And this one was from a group lawfully created by Congress to war on poverty!

Considering the reasons for objection, I group the probable real reasons to be as follows:

1. The requirement that black people be accommodated (present occupants of substandard housing) if found qualified by H. U. D.

2. The requirement that poor people be accommodated—particularly if this means that about 90% of the tenants will always be receiving rent supplements; (I perceive this to be the real objection to a proposed low rent housing project in a community now largely occupied by black achievers in Cleveland, Ohio).

3. The requirement that families with children are to be encouraged as are old people.

4. The impact on the local school if these apartments are nearly all quickly filled by prolific young families having several children.

Surveying the law of the English speaking peoples for almost 1,000 years now, I perceive (in exercising the authority vested in public offices) philosophical attitudes ranging all the way from that of a "Royal Commission" to that exemplified by those well understood words in the American vernacular, "The Buck Stops Here," forthrightly displayed on the desk of one President of the United

States. Although it would be pleasant and convenient to refer this to a "Royal Commission" as described by Sir Alan Herbert[31] where:

"The necessity for action was clear to everyone, But the view was very general that nothing could be done, And the Government courageously decided that the Crown should appoint a score of gentlemen to track the trouble down—

"Which always takes a long, long time."

But I can not believe such a disposition would comport with Article I, Section 16, Ohio Constitution requiring that in Ohio justice be administered "without denial or delay." Frankly, I deplore the fact that I have required so much time and am taking so many words to decide this case.

But long ago I learned that for me only patient, persistent examination of everything known to have connection with any controversy is necessary before I can feel confident that I have a reasonably good understanding of both the theoretical and practical aspects of matters involved. And for me, in our growing urban society the great main practical issue presented here is, "Are we going to find a way to succeed in providing housing for millions in our urban society as well or better than we in times past provided benefits to beneficiaries of Congressional action such as—

1. The Railroad Land Grant Acts of 1856 and 1862;
2. The Land Grant College Act of 1862;
3. The Homestead Act of 1862 and numerous amendments thereto in the 1800's and, since 1900 such as—
1. The Air Mail Contracts Acts of 1934 and 1935;
2. The G. I. Bill of Rights Act of 1944;
3. The Interstate Highway Act of 1956 as since amended and other similar Congressional measures too numerous to mention here, or are we not?"

My determination is to try. For it seems to me most

---

[31]Taken from "Pageant on Parliament (Suggestions for the Same)" found in "Mild & Bitter," p. 254. First printed in *Punch*, Vol. 186, June 27, 1934, 708.

likely that practically everyone involved in this litigation is either a direct or indirect beneficiary of mentioned Congressional legislation, despite the fact that probably only a few know or realize this.

Moreover, I have received not a little inspiration from the words of Neil Armstrong, native of the adjoining county of Auglaize, when he became on July 20, 1969, the first man to set foot on the moon and said "One small step for a man, a giant leap for mankind."

Hopefully, I have examined this situation with sufficient thoroughness, care, and perception that the solution at which I have arrived will constitute "One small step for better housing in Lima, a giant leap for better housing in Ohio and the U. S. A."

Another reason for taking so much pains with this decision has been that the court has been introduced to a number of aspects of city planning while being unable to forget the words of Oskar Stonorov, Architect and City Planner, from a speech at Cooper Union, reported in The Toledo Blade, August 8, 1965: "We are always capable of doing the wrong thing at the wrong time." And of course often we cannot be sure what the right thing to do is.[32]

Nor can the court believe that it would be a bad thing for every resident of Lima, and particularly every resident of Northland to read in the November, 1969, issue of Reader's Digest the article at page 157, entitled "The Suburbs Are Changing" by Wolfgang Langewiesche.

After describing a modern "neighborhood" of 900-1200 houses or apartments for 3000-5000 people called Columbia he concludes:

---

[32]For an interesting introduction to city planning by computer, see: Journal of the American Institute of Planners, Vol. 32, p. 3, January, 1966—"Gaming Simulation for Urban Planning" by Richard L. Meier, Prof. of Resource Planning (U. of Mich.) and Richard D. Duke, A. I. P. —Assc. Prof. (at both U. of Mich. and Mich. St. U.)

For basic exposition of the public and race relations now involved in our urban areas see Public Relations Journal, November, 1967, issue, p. 8. "After the Long, Hot Summer * * * Some Thoughts for a Cool Winter," by Frank W. Wylie (of Dodge Div., Chrysler Corp.); and "Race Relations: A Plan to Avoid Social Disasters" by D. Parke Gibson (Negro Market Analyst).

"You can see how all this changes the climate in which people live. Kids and grown-ups, too, have a sudden increase in *practical* freedom, a wider choice of things to do, a wider choice of times to do them in.

"And that is the intention. Town planners are convinced that the layout of a community has a profound effect upon its people. The human being thrives more where there is more diversity, more privacy, a broader range of contacts, a greater variety of things to do and of ways to be. James W. Rouse, the creator of Columbia, says that he wants his town to be 'garden for people to grow in.' Nice phrase; and a good summing up of what the change in suburbs is all about."

At this point I anticipate a number of excellent legal minds will declare that what I have promulgated as lawful will enable appellant in respect to some particular individual, very soon to discriminate in housing on the basis of race. In terms of grammatical logic I do not deny it, but in terms of practical results over the years and takng people as they have been—and as many now are judging only from the objections to this project—this subservience to grammatical logic in uncounted housing situations, I perceive, is clear illustration of law where "the letter killeth, but the spirit giveth life." And not infrequently among white men I have heard declarations of fealty to this absolutist grammatical view of Constitutional requirements and if my senses failed me not, I perceived a cynical preference for the position because the speaker was certain that, people being as they are, nothing would be done in matters personally affecting him. And, if I am not mistaken, if such doctrine prevails in cases like this nothing much will be done except to create more terrible problems for our posterity than now confront us.

The reason is that to date in most cases white builders and brokers who would do justice to the negro or other minority groups must suffer the full economic burden of the almost universally present uniform practice (in law "usage") of discrimination while the contumacious who believe their ancestry entitles them to special privileges over certain other human beings of a different ancestry—

especially if the fact is visible—either profit by the fact or arrange themselves to their satisfaction in an "exclusive neighborhood."[33]

Moreover, as is so often the case when we search carefully into the resources of our law, we find that great judges in days long gone by not infrequently handed down wise decisions that have become forgotten, although when found their merit sparkles like a newly polished diamond.

While the darkness of legalized slavery was a part of

[33]An interesting example of an attempt to create an "exclusive" residential neighborhood may be found in the case of *Ellison* v. *Stewart* (1928), 9 Erie Co. L. J. (Pa.) 305. Here the owner of "Green Garden Terrace" subdivision of building lots created restrictions by deed applicable to the sale of all lots, not only as to the first sale of each lot but to every transfer of title thereafter. The common covenant was:

"It is further agreed that the grantees, their heirs or assigns shall not sell, lease or convey the property herein described to any person of Polish, Italian, Austrian, Russian, Hungarian, Slavish or Negro descent, or to any other person or persons whose reputation is such as would not be desired in a first class residence section."

Lot No. 1, Block No. 1 in this subdivision was first sold by the developer Butt in 1915 to Pease; in 1916, Pease sold to Mertens, and later in the same year Mertens sold to Ellsworth; in 1917, Ellsworth sold to Hanson; in 1920, Hansen sold to Stewart (all of which transfers occurred without complaint). In 1926, Stewart sold to Cosimo and Angiolina Surgo, husband and wife, who were concededly of Italian descent. Thereupon Ellsworth and other owners of lots with homes erected in "Green Garden Terrace" brought a bill in equity in the Common Pleas Court of Erie County, Pennsylvania, praying (1) that the deed to the Surgos be declared null and void; (2) for an injunction restraining the Surgos from acquiring any title to the lot; (3) for an injunction restraining the Stewarts from conveying the lot to the Surgos or any other persons coming within the language of the restrictions; and (4) any other proper relief.

The court dismissed the bill, finding the restriction to be upon alienation rather than a reasonable restriction concerning use and occupancy, and that the right of alienation is an inherent and inseparable quality of a common law estate in fee simple.

Another problem suggested itself because, following the restrictive language quoted above, each deed contained these words: "In the event of such sale, lease or transfer being made, said property shall revert to the grantor, Daniel E. Butt, his heirs and assigns." The court found it need not in this case decide concerning the effect of these words, as neither Butt, nor any of his heirs were among the plaintiffs.

our current law the rule was widely acknowledged that—
"Where in a specific case the words of the statute would lead to a practical result at odds with the reason and purpose for a statute, the court will make an equitable interpretation and decree in accord with the purposes and reason of the statute."[34]

In short, this court finds that the substance, the reason and purpose of the Civil Rights Acts justify the formulation and judicial approval of equitable housing quotas based upon or geared to census facts available to all where desired, and above all where believed necessary economically in order to cope with the usage of the community which would otherwise create a greater volume of discrimination. In all probability such quotas should not be judicially enforced for periods longer than 21 years, a figure much utilized historically in land law to say nothing of the fact it commonly measures the length of one generation, and exceeds a common mortgage term of 20 years. The court recognizes this to be state action, but denies that it is state action which impairs equal protection; it is state action necessary to provide freedom to the productive in the ex-

[34]As examples of this rule, see:

*Hersha* v. *Brenneman* (1820), Pa., 6, S & R 2, 4 holding guardian had right to exercise right of parents who predeceased testator in favor of his children, although the statute made no such provision.

*White* v. *Carpenter* (1830), N. Y. Chancery, 2 Paige 217, 229 where deed was not permitted to be vitiated by one invalid trust where there were meritorious claims involved.

*Simonton* v. *Barrell* (1839), N. Y. S. Ct., 21 Wend. 362, 364-5, where defendant was not permitted to escape liability because no statute provided a remedy to the executors or administrators of the plaintiff.

*U. S.* v. *Freeman* (1845), 44 U. S. 556, 565, 3 How. 556, 11 L. Ed. 724, 728, in determining pay and emoluments of a brevet officer of the Marine Corps, required *in pari materia* construction of several statutes, and declared that if a thing contained in a subsequent statute be within the reason of a former statute, it shall be taken to be within the meaning of that statute.

*Hoquet* v. *Wallace* (1860), N. J. 4 Dutch 523, where procedural statute for benefit of defendants generally was not permitted to be invoked by a third party in order to give his own judgment claim a higher priority.

ercise of their civil right to engage in the worthwhile activity of producing adequate shelter for multitudes.

Essentially, the court holds that the realities of the situation require some such measures in order to provide a greater measure of equal protection in fact than has heretofore been possible despite the finest and most idealistic in abstract theory.[35]

The court now considers

THE PROPRIETY OF ENFORCING CIVIL RIGHTS IN STATE COURTS

Prior to *Jones* v. *Alfred H. Mayer Co., supra,* there was, I suppose, little reason to examine the claims of federal law in the civil rights area in state courts as private discrimination, except in certain specified areas, was not declared illegal and the federal statutes were held to be proscriptive of only official state action.

But if Sections 1981, 1982 and 1983, Title 42, U. S. Code, Health and Welfare, now have an all pervasive existence in every judicial district (whether state or national) in the United States, as I perceive they do, then it seems certain that the rule of *Testa* v. *Katt* (1947), 330 U. S. 386, 91 L. Ed. 967, 67 S. Ct. 810, 172 A. L. R. 225, requires that these statutes be observed and applied in state courts. In this case the state of Rhode Island was precluded from refusing to entertain an action to enforce the civil penalty (triple damages and attorney fees) provided for violations of the World War II Rent Control Act, more particularly "Section 205 (e) of The Emergency Price Control Act—[January 30, 1942] 56 Stat. 23, 24c 26 as amended [June 30, 1944], 58 Stat. 632, 640, c 325, 50 U. S. Code Appx., Section 925 (e), II FCA title 50, Appx. 25, Section 205(c)."

This principle that state courts are ordinarily obligated to enforce all provisions constituting a part of "The

---

[35]The legal profession has given much attention to and is responsible for numerous laws providing protection to the minority stockholders of corporations. These laws recognize that the very fact of minority is a large part of the problem and that in numerous situations there is no *vice versa* of worth to the minority stockholders. It seems clear to me that the resources of our law authorize practical measures which will protect minority people as well as minority stockholders.

supreme law of the land" seems to have long been recognized although hardly discussed.[36]

Also, I note under present annotation Nos. 139 to 142 U. S. Code A. Section 1983, a total of 15 federal cases dealing with jurisdiction to entertain claims of invasion of civil rights in federal courts where there is *no diversity* of citizenship. Of these cases eight hold that such claims must be brought in state courts, seven that they may be brought in federal district courts. *Dargan* v. *Yellow Cab Co.* (1953), 346 U. S. 840, 98 L. Ed. 361, 74 S. Ct. 52, denied certiorari where it was ruled that such claims must be filed in state courts. In *Kenney, J.,* v. *Killian* (1956), 352 U. S. 855, 1 L. Ed. 2d 66, 77 S. Ct. 84, and *Kenney, J.,* v. *Hatfield*

---

[36]See *County Court of Braxton County* v. *State of West Virginia* (1908), 208 U. S. 192, 52 L. Ed. 450, 28 S. Ct. 275, where decision of the issue was not necessary but Brewer, J., for a unanimous court said at page 276: "* * * no state can, in respect to any matter, set at naught the paramount provisions of the National Constitution."

In *General Oil Company* v. *Crain* (1908), 209 U. S. 211, 52 L. Ed. 754, 28 S. Ct. 475, a Tennessee trial court enjoined 25c per bbl. inspection fee on oil sold in Arkansas, Louisiana and Mississippi after which it was ordered from Ohio and Pennsylvania sources and Memphis dealer merely changed it from wholesale to retail quantities, as undue burden on interstate commerce. The Supreme Court of Tennessee reversed because of 1873 statute denying jurisdiction to its own courts in cases "with a view to reach the state, its treasury, funds, or property." Judgment affirmed. Six Justices held there was factually no undue burden; 1 Justice concurred on ground Tennessee court could deny its courts the specified jurisdiction; 2 Justices dissented, said facts did not encompass oil in question because statute applicable only to illuminating fluids "which may be manufactured or offered for sale in the state" and secondly, was an undue burden on interstate commerce.

*Ward* v. *Board of Commissioners of Love County* (1920), 253 U. S. 17, 64 L. Ed. 751, 40 S. Ct. 419, Van DeVanter, J., for a unanimous court held Oklahoma state court bound to recognize rights of Indians to exemption from real estate tax granted by federal government and Congressional action invalidating vested grant was unconstitutional.

In *Iowa-Des Moines National Bank* v. *Bennett* (1931), 284 U. S. 239, 76 L. Ed. 265, 52 S. Ct. 133, Brandeis, J., for a unanimous court required Iowa state courts to give *de facto* as well as *de jure* benefit, to National Banks located there, of federal statute that they should not be taxed "at rates higher than were exacted of competing moneyed capital."

(1956), 352 U. S. 856, 1 L. Ed. 2d 66, 77 S. Ct. 84, two cases from the 6th Circuit, certiorari was denied where it was ruled in a Michigan case that such claim might be filed in federal district court. From this I can only be confident that there is respectable authority that state courts have and should exercise jurisdiction in this field.

Perhaps we should be reminded that as a matter of course we have long enforced in state courts the rights provided to members of our Armed Forces by The Soldiers and Sailors Civil Relief Act, 50 U. S. Code Appx. Section 501 *et seq. Vara* v. *Vara* (1961), 85 Ohio Law Abs. 268, 171 N. E. 2d 384.

For a case where persons in the position of the neighbors here were unable to show a violation of "any zoning or other governmental regulation applicable to the locality" could not prevent a Housing Authority from locating a low rent public housing project in their locality, see *Philbrook* v. *Chapel Hill Housing Authority* (1967), 269 N. C. 598, 153 S. E. 2d 153.

Having made the foregoing analysis and declaration of applicable substantive law, we next consider—

THE JURISDICTION AND DUTY OF THE COURT

RE: APPEALS FROM DECISIONS OF A POLITICAL SUBDIVISION

Section 2506.01, Revised Code, effective September 16, 1957, provides for an "*Appeal from decisions of any agency of any political subdivision.*"[87] This court concurs with

---

[87]In pertinent part, Section 2506.04, Revised Code of Ohio, reads:
"The court may find that the * * * decision is
    unconstitutional,
    illegal,
    arbitrary,
    capricious,
    unreasonable, or
    unsupported by the preponderance of substanial, reliable and
        probative evidence on the whole record.
Consistent with its findings, the court may
    affirm,
    reverse,
    vacate, or
    modify the * * * decision,

the opinion of Judge Leach in *Broad-Miami Co.* v. *Board of Zoning Adjustment of City of Columbus* (1959), 89 Ohio Law Abs. 140, 185 N. E. 2d 76, to the effect that in appeals such as this the court is not confined to a mere curbing of extreme actions, or positively illegal ones, or abuses of discretion, and that it places in the court authority to correct, revise or reverse the action appealed from on any ground deemed reasonable. Also, as I have heretofore noted, in the area of civil rights, Sections 1981, 1982 and 1983, 42 U. S. Code, constitute supreme law which is to be utilized and justly administered by the court, in special proceedings such as this as well as generally.

R. C. 2506.02 provides for a filing, within 30 days after the filing of the notice of appeal, of a complete transcript of all the original papers, testimony and evidence offered, heard and taken into consideration in issuing the order appealed from. This was done prior to the hearing by the court of this appeal.

R. C. 2506.03 provides in part,

*"Hearing on Appeal"*

"The hearing of such appeal shall proceed as in the trial of a civil action but the Court shall be confined to the transcript as filed pursuant to Section 2506.02 of the Revised Code, unless it appears on the face of the transcript or by affidavit filed by the appellant that:

"(A) The transcript does not contain a report of all evidence admitted or proferred by the appellant.

"* * *

"(C) The testimony adduced was not given under oath.

"* * *

"(E) The officer or body failed to file with the tran-

---

or

　　　remand the cause to the * * * body appealed from with instructions to enter an order consistent with the findings or opinion of the court.

The judgment of the court may be appealed by any party on questions of law pursuant to Sections 2505.01 to 2505.45, inclusive, of the Revised Code."

script, conclusions of fact supporting the order, adjudication or decision appealed from, in which case, the Court shall hear the appeal upon the transcript and such additional evidence as may be introduced by any party. At the hearing, any party may call as if on cross-examination, any witness who previously gave testimony in opposition to such party.''[88]

At the hearing the court found these quoted portions of R. C. 2506.02, to be applicable to this appeal and considered all testimony and exhibits submitted by the parties. In addition the court has taken notice of all applicable law as required by R. C. 2317.44 and 2317.441, matters of common knowledge, and data found in official reports of the Bureau of the Census.

From the foregoing the court concludes that it has power to do what the agency appealed from (here tne Board of Adjustment) should have done (based of course upon law and reason).

Under the provisions of Section 1303.01, C. O. L., appellant did submit to the City Planning Commission a plan for the development of a 200 unit, 12 building apartment house complex to be located upon its 13.06 acres. The commission gave the matter official consideration and held public hearings in respect to it. All concede that under the zoning law, in force when the application was made the application was for use then and now authorized, a use which had been authorized since 1964 at least, judging from the city zoning map accompanying the copy of the Codified Ordinances of Lima introduced in evidence.

As we have seen (Footnote 10, *supra*), the commission properly rejected the first recommendation of the city's Director of Planning, Mr. Kruse, that the area be rezoned to exclude apartment house use.

---

[88] This court is convinced that the equity required by Section 1983 will not permit either public officials or the attorneys of private parties, in these administrative proceedings, by the creation of narrow records omitting matter properly the subject of judicial notice, to foster the deprivation of civil rights in any invidious manner.

Mr. Kruse's other recommendations to the commission made May 22, 1968, were:

"2. That prior to City Planning Commission action on the development plan, the owner, Lakewood Homes, Inc., and/or Ben Cogen, should submit a final plat * * * including among other items, the following:

"Building setback lines,

Street right-of-way (public and private)

Street names if public

Building locations

Recreation areas (public or private)

Utility easements

Parking areas

Parkways (public or private)

"Copies of said plat should be advanced in accordance with the normal plat procedure and, in addition, copies should be provided to all utility agencies by the Development of Planning for their review and official comments," and

3. Specific preliminary recommendations * * * [supra] concluding with the recommendation that the project be taken 'under consideration and that a study session be held to review the rent supplment factors'."

Mr. Kruse's June 26 report acknowledges receipt of drawings for Northwood Apartments and opportunity to study them; more information on the rent supplement; that the drawings are for 2 story brick veneer on wood frame over concrete slab apartment buildings; that one 1575 square foot and one 1750 square foot tiny tot play areas are shown, specifically designating only 3,325 square feet for recreation, and comments, "with 200 dwelling units in the project area to be served, the proposed recreation facilities are somewhat inadequate and the space as designated is not fully appropriate in size."

His final specific recommendations then are:

(a) More adequate recreation space and facilities should be specified for the apartment project.

(b) Is omitted.

(c) Utility easements should be defined and located.

(d) Is omitted.

(e) The southernmost parking lot should be relocated either 25 feet from the south lot line or 12′ therefrom with a four foot redwood woven fence installed along same.

(f) The traffic circulation plan is essentially unacceptable as presented. No outlet to Lewis Boulevard should be permitted. Access should be by a loop public street connecting, if possible, Brower Road and North West Street in a manner that would discourage through traffic.

(g) Pedestrian access to Lewis Boulevard and between the six northernmost buildings and six southernmost buildings should be provided.

(h) Some additional buffer consideration should be given between the project and Timmerman Ford property.

(i) Buffer screening should be provided for the project.

(j) Post and floodlight outdoor lighting facilities are identified on sheets E1 and E2 of the drawings. All exterior wiring should be underground and all exterior lighting on the applicant's property should be installed so as not to disturb the surrounding neighbors.

The trouble with the record presented to the Board of Adjustment is that it is wanting in the specificity necessary to enable the board to take intelligent action. The Planning Commission is obliged to respect appellant's civil rights to utilize its real estate for a purpose authorized by the zoning code, here an apartment house. Consequently, when the commission refused to approve the development plan presented by Mr. Cogen, it was incumbent upon the commission to provide him a specific plan as near to the one proposed and in furtherance of his lawful purpose under the zoning code, which it would approve. Also, to give him opportunity to accept or reject, in whole or in part, again with all specifications necessary to proceed toward a practical realization of appellant's lawful purpose. In arriving at an acceptable plan the commission is obligated to base its action upon reasons having a firm

foundation in known law, science, reason, and the best experience of the housing construction industry. In making its decision, it has a heavy burden to avoid frustrating appellant's purpose by invoking superficially plausible reasons without substantial relation to the cause of appellant's legitimate purpose.[89] Nor may persons in appellant's position be subjected to requirements not commonly required of all making similar proposals of a like ultimate purpose when lawful under the zoning code because some circumstances make the builder's particular purpose unpopular in the area.

The court perceives that in modern urban housing "recreation space and facilities" are of great moment and great effort should be made to meet a planning standard based upon an intelligent, rational consideration of the specific project and within known planning guidelines, where available, of optimum and minimum standards.

No doubt the commission is entitled to know if public

[89]For me there can be but little doubt that Sections 1982 and 1983 not only provide but require that equity strike down all legal devices and regulations whose only efficient purpose is to foster discrimination on a racial, religious, ethnic origin, or other illegal basis. Also, that when it appears that the effect of such law, regulation, or practice is to foster actual racial discrimination, a heavy burden of positively showing that it does not is placed upon the official or officials concerned. And if they are clearly wrong they may be required to pay all the costs and all the attorney fees of any complainants, together with fees of their own counsel. See *Stringer* v. *Dilger* (1963), 313 F. 2d 536.

Conduct reported at page 352, "Race Relations," by Michael Banton, 1967, Basic Books, New York, I perceive, is forbidden:

"* * * The sheer cost of suburban housing excludes Negroes from many suburban areas. When house prices are insufficient to keep them out, there are legal devices and building regulations which can be manipulated to achieve the same effect. One builder told an interviewer that he would very much like to sell suburban houses to Negroes but that to try to do so would ruin him economically. 'If I sold just one suburban home to a Negro, the local building inspector would have me moving pipes three-eights of an inch every afternoon in every one of the places I was building; and moving a pipe three-eights of an inch is mighty expensive if you have to do it in concrete.' Such practices can be combined with social and economic pressures upon white owners of older houses and upon real estate brokers to prevent sales to Negroes. (Grodzins, 1958: 5-8)."

utility services are planned to be available in sufficient quantity for construction purposes and for the project when ready for occupation, but appellant is entitled to have public utility services as are other members of the public.

Certainly traffic circulation may be routed to require a greater number of autos to use one street than another, but denying any outlet to an adjoining street may not be done, unless an appropriate compensation is made to the owner for deprivation of the use of such street.

Parking facilities today are, of course, of fundamental importance and the court notes that apparently appellant did provide for same according to common planning standards in a way the commission did approve.

All other items of legitimate concern may be specified, but they may not be made unduly burdensome in comparison to general standards of new construction.

Appellant and the commission are here obligated to co-operate to facilitate appellant's purpose to build new housing of good quality on appellant's land by utilizing provisions of federal law.

Before summarizing my conclusions I have felt a necessity—as a white American who does not hesitate to say that he believes in Christianity and who agrees with Dostoyevsky when he says, "Even those who have renounced Christianity and attack it, in their inmost being, still follow the Christian ideal, for hitherto neither their subtlety nor the ardor of their hearts has been able to create a higher ideal of man and of virtue than the ideal given by Christ of old. When it has been attempted, the result has been only grotesque." [The Brothers Karamazov, Part II, Book IV, Chap. 1 (1880).] To file hereto appendices X and XI entitled, respectively, "Observations of a Personal Nature" and "Observations and Reflections on American History."

Just why I should feel this necessity I do not know. But as one who has certainly been no firebrand for any particular panacea for the world's ills but who for decades has had a conviction that it is well for men to strive to do good, and as one who has for years made some effort to carefully observe the human situation in which he found

himself, it seems appropriate that I share my understanding as a man with both the lay and professional persons affected by this decision.

## CONCLUSION

Having now explained my interpretation of the law applicable to the facts exemplified in this case, my decision is this:

1. The City Planning Commission was obligated under Section 1303.01, C. O. L. to inform appellant as to specifically (1) what it did not approve in his development plan and (2) at least one plan, altered as little as possible, which it would approve.

2. In exercising its jurisdiction under Section 1303.01, the Commission is obligated to facilitate appellant's project for utilizing its real estate for a lawful purpose under the Zoning Code, especially where he is trying to faithfully comply with the local code.

3. In exercising its jurisdiction, the commission may not frustrate appellant's efforts to use its property for a lawful purpose by (1) the invocation of superficially plausible reasons unrelated to the owner's purpose—here residential housing, or (2) inventing requirements not commonly required of substantially similar structures.

4. This is particularly true when the project being considered is (1) that of a private citizen who (2) proposes to utilize federal law so as to provide benefits to persons Congress has declared to be eligible for such benefits.

5. In exercising jurisdiction in respect to a private citizen who desires to locate a lawful development upon his own property agencies such as the Planning Commission, City Council, and the Board of Adjustment are obliged to respect equitable principles in the application of the law.

6. When administrative agencies (whether local, state or national) have twice fully considered the aspects of a proposal such as appellant's here, equity requires that builders, on a third review, are entitled to a declaratory judgment or its equivalent, telling the would be builder what he may lawfully do. Such a judgment will strike

down all requirements of state or municipal law that are based on no valid reason, or only superficially plausible reasons, and will enjoin the unreasonably contumacious from interfering with the construction of an authorized project.

Consequently, counsel may prepare a journal entry reversing the decision of the Board of Adjustment appealed from and remanding the cause to the Planning Commission for action to be performed within 30 days of the order, and consistent with this opinion.

*Decision reversed and cause remanded.*

APPENDIX No. II
MINUTES OF BOARD OF ADJUSTMENT
FILED AUGUST 28, 1968

BOARD OF ADJUSTMENT
Meeting of August 14, 1968
Members Present:  Mr. Frank B. Cory
                Mr. Earl Ghaster
                Mr. Robert Grimes
                Mr. John W. MacDonell
                Mr. Ted Wilson
Also Present:  Mr. George L. Kruse, Jr., Director of Planning
                Mr. Roy Coon, Building & Zoning Admr.

The first matter for consideration by the Board was the Minutes of the meeting of August 7, 1968, two corrections as appear in the original of the Minutes as approved and ultimately signed by Mr. Cory were made by suggestion of Mr. MacDonell and were the change of the name of MacDonell to Dickason as appears on page 4, and the change of the word "closed" to clothed as it appears on page 3.

The correction having been made, it was moved by Mr. Cory, seconded by Mr. Wilson, and unanimously carried, that the Minutes of the meeting be approved but not read.

The next matter to be considered was the Application of Lakewood Homes, Inc., relative to its proposed apart-

ment complex at the Southwest quadrangle of Brower Road and Northwest Street Road.

Mr. Cory moved, seconded by Mr. Ghaster that Mr. Dickason be allowed to amend his Application, such amendment having been filed with the Board on August 13, 1968, and including both Mr. Dickason's letter addressed to Mr. Basinger and the actual amendment itself.

Mr. Basinger then resumed the situation to date, the purpose of the meeting and asked Mr. Dickason if he wished to speak on the issues of law involved. Mr. Dickason stated that his feeling was that the matter had been considered, that he could speak for an hour and a half on the subject, but that he would waive his opening argument in favor of Mr. Bowers, Attorney for some of the parties present, and would reserve his time to rebut.

Mr. Bowers stated that he had no comments in view of Mr. Dickason's statement and the Director of Law's opinion. Mr. Cory stated to Mr. Bowers that he was somewhat taken back by his statement that he did not feel he had anything to say, and Mr. Bowers said that he felt that the opinion of the Application had not changed, notwithstanding the amendment. If this changed the Director of Law's opinion he then wished to be heard, and if not he would rest with the opinion.

Mr. Cory stated that he sure [sic] whether or not Mr. Evans, the Director of Law wished to go farther, but noted that originally the Application did not seek a variance, and there was no notation in the opinion in regard to this matter.

Mr. Evans stated that he just recently received the opinion, that he had not had the opportunity to study the matter, and was not in a position to interpret it for the Board at this time.

Mr. Ghaster inquired as to when Mr. Evans would be in a position to give an opinion. After some discussion, Mr. Evans indicated that he thought he could be ready in one week, if the Board had a meeting at that time.

Mr. Dickason stated that he didn't know why the Director of Law couldn't give his opinion this afternoon, because the question was simply whether or not Lakewood

Homes, Inc., had the right to a variance. He didn't see why the matter couldn't be spelled out at this meeting.

Mr. Bowers stated that he found only two issues, these being whether or not the Board had any jurisdiction at all, the second as to whether or not they could give a variance on the basis of a hardship.

Mr. Basinger stated that it was his opinion that the only thing before the Board was the matter of an appeal, and that under the circumstances, the variance did not seem to be the issue.

Mr. Cory stated that no useful purpose would be served by the delay and that the parties had been extremely patient to this point. He addressed a question to Mr. Dickason relative to his concern as to the amendment to the Application filed, the import of which, as he understood it, was that the Board of Adjustment would sit in judgment of the City Planning Commission. Mr. Cory stated that as he understood the prayer, it requested that the Board vary the Application of Section 1303.01 C. O. L. as interpreted by the City Planning Commission. He stated that if the Board was permitted to interpret this, it would be asking the Board to interpose its judgment as to what would be asking the Board to interpose its judgment as to what was in the minds of the City Planning Commission at the time, granting that three members of the Board were also members of the Planning Commission, and pointed out that all members of the Board were trying to sit solely in judgment of this matter without regard to the aspect previously treated. He stated that he did not feel that the Board could interpret that decision, nor had the authority to interpret the validity of this Section or the constitutionality thereof, feeling that this was a judicial function, and that it would be capricious and unreasonable on the part of the Board to attempt to do so. He went on to say that he felt the validity of the Section was the sole question and whether that Section was invalid, because it was vague and unreasonable, and therefore that Mr. Coon erred in his denial.

He stated that there was nothing before the Board other than the question of the invalidity of the statute to

indicate that Mr. Coon did err. Mr. Cory went on to say that not only were the duties relative to the Building and Zoning Administrator set out in the Section heretofore set forth, but that also under the provisions of Section 104.21 of the Ordinances, and that he was charged with being duly satisfied that plans for a building conform to all pertinent Sections and that therefore, it must be presumed that Mr. Coon was looking at all. He stated that under these circumstances he was at a loss and could not give the Release sought.

Mr. Ghaster stated that he agreed with Mr. Cory. and that the only way in which the Variance could be granted was on the basis of unnecessary hardship. Mr. Dickason then went on to say that the function of the Board is to provide elasticity in the administration of a comprehensive Zoning Code, that it must be a comprehensive Code, but that he realized in certain areas there would be problems, it was for this purpose the Board was created and but for the Board, every little problem would become a judicial problem. He stated that discretion was given and that only the Board had such discretion as opposed to the City Planning Commission which had none. It had the power to determine the issue and if it had no power to grant the Release sought, then all the meetings that had been held in regard to this matter were worthless. He stated that if the Council and City Planning Commission had erred, there must be power in the Board or why run the matter through the Board of Adjustment; that the Board did have power based on hardship.

He pointed out that attached to his original Application were verbatim copies of the City Planning Commission Minutes of prior meetings which had been approved, and that when you go to these Minutes you find only one reason for disapproval, which was the location. He pointed out that the Planning Commission had said that they had no complaint about the construction at all, except from the standpoint of location.

He stated that this was the first time that the City Planning Commission made a mistake in regard to this matter, and that this mistake relative to the question of de-

nial on the basis of location was a hardship to Lakewood Homes, and that in effect the City Planning Commission overruled the provisions of Section 1321.02 C. O. L. which gave authority to establish a Class II-Business, therefore settling the question of location in the area, because this Section also permitted the construction of multiple family apartments.

He stated that he was not saying there was no need to find that the Statute was unconstitutional, assume that it is, the Board could still give relief by virtue of the fact there were no established criteria; that all other Sections of the Zoning Code constituted the standards on which relief could be given relative to the apartment and clearly the applicant had complied in all other areas.

The Application having been denied, there was no place, Mr. Dickason said, to which the builder could take his appeal. He stated that there was no right on behalf of the Commission to say that this was not a proper location, and that the City Planning Commission made an error. He stated in addition that the issue of Civil Rights crept into the matter, and that under the provisions of Section 4112.-02 Revised Code Legislature had forever settled this question, and that the Commission's second error had been to allow evidence or argument to be heard in the case relative to the nature of the prospective tenants. He stated that the depreciation value of the neighborhood, schools, the race issue, et cetera, was prohibited by the terms of the Civil Rights Act, and that there was a hardship as a result; that in addition there was a hardship in having to go to court in that the building costs were rising daily.

Mr. Bowers stated that Mr. Dickason had gotten off the basic issue; that the Board of Adjustment certainly had power relative to the granting of hardship, but it could not amend or rewrite the Zoning Code, but was primarily created to grant Variances.

He stated that his points were that the Board, if it entertained authority to grant the Release sought, would be capricious; 2—that the Board had authority to act in given areas, but this was not a proper area, and 3—that to declare the Section unconstitutional was without its juris-

diction. He went on to say that Mr. Dickason spoke of hardship and that there was as much of a hardship of the residents in the areas, and that if the Board entertained jurisdiction, it would be a case of its acting arbitriciously relative to the question of constitutionality. He stated that he felt Mr. Cory was right, and that the Director of Law's Opinion had not been changed by the filing of the amendment.

Mr. Dickason then interjected that there was, under these circumstances, no case where the Board could grant relief, that he was required to exhaust all his remedies, that he could not go from the City Planning Commission to the Court, and had to take a step by step procedure and that the Court would inquire as to whether or not he did.

Mr. Cory stated the remedy, he felt, was judicial relative to the question of whether the law was vague and indefinite. He stated he didn't know the answer to this, and if there was a question of hardship, hardship was a matter which and should have been treated by the City Planning Commission, and that he did not feel the Board had authority to consider that prior action. Thereafter, Mr. Cory stated that he would move that the Application be denied on grounds which were as follows: 1—that it was his feeling that the Board was not clothed with the authority to pass on the actions of the City Planning Commission and to make a determination that the City Planning Commission had erred in the consideration of the matter as presented to it. 2—that it was his opinion that the Building and Zoning Administrator, in the light of the existing provisions of the Ordinances of this City did not err in refusing to grant a permit considering the inability of the Board of Adjustment and the inability of the Building and Zoning Administrator to render an opinion as to the validity and constitutionality of Section 1303.01 C. O. L. Mr. Cory's motion and remarks were seconded by Mr. Ghaster, who stated that he agreed with the reasons given for the motion. Mr. Cory said for what it's worth, the proper source for relief in this matter would be in the court.

There being no further discussion relative to the motion, a voice vote was taken resulting as follows: Mr. Cory

—yes, Mr. Ghaster—yes, Mr. MacDonell—yes, Mr. Grimes —abstaining, Mr. Wilson—yes.

There being no further business before the Commission, the meeting was declared adjourned.

Respectfully submitted,
BOARD OF ADJUSTMENT
MALCOLM D. BASINGER
Deputy Secretary

APPROVED:
Chairman

APPENDIX No. III

CRITERION ORDINANCE

AN ORDINANCE: APPROVING THE DEVELOPMENT PLAN FILED BY CRITERION HOMES, INC., FOR 7.344 ACRES OF LAND LOCATED AT THE NORTHEAST CORNER OF McKENZIE DRIVE AND ANN WAY AS DESCRIBED HEREIN.

Morrisey
Chorpening
Shepherd
Ellis
Stevick
Mullenhour
Lusk
Moyer

WHEREAS, Criterion Homes, Inc., has filed with the City Planning Commission a development plan for a tract of land consisting of 7.344 acres as required by Section 1303.01 of the Codified Ordinances of The City of Lima; and

WHEREAS, the City Planning Commission has approved said development plan after public notice and hearing; and

Whereas, the Lima City Council has given public notice and held a public hearing on said development plan; and

WHEREAS, Council finds that for the said tract as a whole, excluding street area but including area to be devoted to parks, parkways or other permanent open spaces,

there will not be less than the required area per family for the area district in which such tract of land is located for each family which under such development plan may be housed on such street; and

WHEREAS, Council further finds that under such development plan the appropriate use of property adjacent to the area included in such development plan is fully safeguarded; Now, Therefore

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF LIMA, OHIO:

Section 1. That the development plan of Criterion Homes, Inc., for 7.344 acres of land located at the northeast corner of McKenzie Drive and Ann Way be, and the same is hereby approved, and the application of use, height, area and year regulations established in part Thirteen, Planning and Zoning Code of The Codified Ordinances of The City of Lima, Ohio 1956 are hereby modified as required by such development plan.

Section 2. That the development plan referred to in Section 1 hereof pertains to the following described real estate:

Being a tract of land in the West 1/2 of Section 26, T 3 S, R 6 E, in the City of Lima, Allen County, Ohio, to-wit:

Beginning at the northwest corner of lot 25483 in Westgate Manor 22; thence along the northerly and westerly line of Westgate Manor 22 with the following courses: South 87 degrees 40' east for 146.00 feet; south 2° 29' West for 33.25 feet; south 86° 23' East for 74.74 feet; south 78° 17' east for 317.48 feet; north 22° 58' east for 260.00 feet; thence north 22° 55' east for a distance of 121.38 feet; thence north 16° 31' east for a distance of 172.00 feet; thence north 89° 21' west for a distance of 773.38 feet; thence south 0° 11' west for a distance of 416.98 feet to the north line of Westgate Manor 22; thence north 89° 34.7' east for a distance of 46.83 feet to the place of beginning.

Containing in all 7.344 acres.

Section 3. That the Clerk of the Council is authorized and directed to cause publication of this ordinance to be made in a summary manner as provided by the City Charter.

Section 4. That this ordinance shall take effect and be in force from and after the earliest period allowed by law.

Passed 5-29 1968                                  Harry Moyer
                                            President of Council
Approved 5-31 1968
Christian P. Morris, Mayor
Attest Margaret Griffith, Clerk

## APPENDIX No. IV

### EXCERPT FROM CITY PLANNING COMMISSION
### PUBLIC HEARING ON NORTHWOOD HOMES DEVELOPMENT
### CORPORATION DEVELOPMENT PLAN

Date: May 22, 1968, 4:15 P. M.

(After concluding the recommendations of the Planning Department of the City of Lima and calling this "Phase I," Mr. Kruse continued to the "Second Phase" of his presentation, as follows:)

"The other portion (of my presentation) pertains to the project with reference to first off—Resolution 1-68, of Lima City Council approving the participation by local owners in a federal rent supplement program, as adopted January 2, 1968. It further refers to a communication from the Federal Housing Administration, Mr. (?) Allen, Director, Subject Matter, Northwood Apartments, Lima, dated April 12, 1968."

(Here, Mr. Kruse read the letter in full.) Mr. Kruse continued:

"Roy, I would appreciate it if you would pass out copies of this, which I will be referring to, copies to the Planning Commission members and to the secretary."

Mr. Dickason: Mr. Chairman.

Mr. Basinger: Yes, Mr. Dickason.

Mr. Dickason: "The matter of rent supplement has been brought up here, and I made no reference to it in my opening statement because I don't believe it is germain or relevant to the matter that's under discussion here. We're asking for . . . these are apartment buildings, and I don't think that this zoning commission has anything to do as to

the type of apartments they're going to be, whether or not these are going to be occupied by persons in the luxury class, middle income, poor income, has absolutely nothing to do with the lay-out of this project . . . and I think that it is out of order for this group to entertain anything that has to do with the subject other than the layout of this subdivision. For that reason, I feel that the commission should restrict the hearing in that regard.''

Mr. Basinger: ''Mr. Dickason has made a point of order relative to the applicability of the regulations relative to the rent supplement program. I presume he has reference to what has been distributed—FHA No. 2504. To this extent, the chair, subject to appeal from the commission is inclined to agree with Mr. Dickason to the extent that while an explanation of the rent supplement program under the FHA might be in order, such information as may pertain to occupants would not be.'' . . . ''It's subject to appeal—if the commission wishes to overturn my decision on that matter it may be done so by motion. The chair hearing no motion from the commission will proceed then, on the basis that status of occupants in this matter will have no bearing and will not be germaine to the issue and considered irrelevant.''

Mr. Kruse: ''May I ask a question?''

Mr. Basinger: ''Yes, Mr. Kruse.''

Mr. Kruse: ''The chair has ruled the rent supplement factors of this program have no bearing on the discussion, and review of the City Council and City Planning Commission?''

Mr. Basinger: ''I can't rule as to City Council, Mr. Kruse. I can only rule for the commission, and I'm talking particularly specifically about occupancy.''

Mr. Kruse: ''I wish to point out, further, that I have been contacted initially by an individual from the Federal Housing Agency of Columbus who requested verbally from my office . . . what was the City Plannng Commission's Position regarding Northwood Apartment Project —the rent supplement program.

Mr. Dickason: ''Mr. Chairman, on that statement, I would like to say that the City Council took care of that

situation on January 7, when it passed the resolution that the rent supplement program would be welcome here. I don't know what the man in Mr. Kruse's office told him, but I have a letter from the Department of Housing and Urban Development, a copy of which I will give to the secretary . . . it's dated May 21st, yesterday, and it says— 'Dear Mr. Cogen . . . re project Northwood Apartments . . . the purpose of this letter is to inform you that evidence of proper zoning must be obtained for this proposal in accordance with the zoning code of the City of Lima, Ohio. We already have the resolution from City Council regarding rent supplement approval; therefore, nothing more is necessary on that particular point. Please submit this evidence as soon as possible. Very truly yours, Roy D. Allen, Director,' and that's dated as of yesterday. So, with the City Council having spoken on that subject and the housing director saying that he has no interest in what the Planning Commission thinks about it, I think any further proceedings in that direction would be out of order.''

Mr. Basinger: ''Let me make myself perfectly clear— to explain rent supplement in terms of what rent supplement is, I would have no objection. What I am objecting to is references to poverty as such—and I would make this further comment. This commission (?) bound by the extent of the statute and it would be my ruling that under the circumstances the intent of the statute would not go to the matter. Now, that it might in some other areas, there would be no question. But unfortunately, I think that's the status of the matter, so certainly as to what rent supplement is—to that extent—I think we can be guided generally by what it says.''

Mr. Kruse: ''I would formally request a legal opinion from our Law Director pertaining to the exclusion in public hearing consideration of the rent supplement program, Northwood Apartments, pertaining to the development plan proposal, including location.''

Mr. Basinger: ''Is there a motion from the floor to request such an opinion?''

(It was moved by Mr. Ghaster and seconded by Mr. MacDonnell.)

Mr. Basinger: "Now this is in regard to the relevancy of rent supplement."

"Any discussion? If not all in favor. Motion carried unanimously."

Mr. Dickason: "I have discussed this matter with Mr. Cogen, and it appears that there is some hesitancy in having this rent supplement program discussed, and we have nothing like that at all, and for that reason we're going to withdraw the motion that it be excluded and Mr. Kruse, so far as we're concerned, may take all the time that he likes in presenting the rent supplement program."

Mr. Basinger : "You may proceed Mr. Kruse. Mr. Dickason has waived any objection that he might have."

Mr. Ghaster: "I think the motion for opinion should still stand—whether we do act on it, or do not act on it—whether it's a purpose of our consideration or not—we better know about it now. We're bound by his approval. (Upon question) We can delete Northwood now, but on the basis of future sites, we might just as well know where the Planning Commission stands as to any possible decision."

"Mr. Basinger: "The chair will delete the specific reference (to Northwood) unless there is an objection of the commission." (There were no objections.)

Mr. Kruse: "I have passed out to the Planning Commission Members the head sheet and pages 1, 2, 5 in the rent supplement program FHA, No. 2504. In the introduction of the rent supplement program, the program is authorized by Congress to provide housing for low income families and individuals who would be eligible for public housing, and who in addition, qualify by the following . . ."

(Here, Mr. Kruse read from the above.)

APPENDIX No. V

EXCERPT FROM CITY PLANNING COMMISSION
PUBLIC HEARING, MAY 29, 1968—3:00 P. M.

Mr. Dickason: Members of the Commission, Ladies and Gentlemen: I'm proceeding with my summation here, although I am not sure if that is the proper subject at this time, and the reason is that we have before us the written

report of the Planning Director of date of May 22, and in it there are listed eleven recommendations. Now, the Planning Director has had a detailed set of the plans for a week, and it would seem to me that his report at this time would be in order as to what, if any, of those objections have been removed, if any, by the supplying of the detailed plans, with reference to lights, and green area . . . and things of that kind. I would say that it would be in order at this time to hear from the Planning Director since he has reviewed the detailed plans.

Mr. Kruse: My review in relation with the comments has not been completed and my recommendations in the report calling for a study session still stand. Undoubtedly some of my recommendations have been complied with.

Mr. Dickason: Of course *I think* that our biggest disappointment here is *that the planning commission has not received objective information in its report on this project. Mr. Kruse is a resident of Northland Area and he has been instrumental in the organizing of a group to* . . .

Mr. Basinger: Mr. Dickason, I am going to *cut this off at this time.* I think this would be improper.

Mr. Dickason: *I think* we have the right to bring to the attention of the committee what's going on here—*that the Planning Director has pursued a course of conduct for a period of several months* . . .

Mr. Basinger: We're getting into a thin borderline here. I think that personalities—when we become concerned with this. *I think this a matter for the administration to investigate* if true. I do not know. I have had no indication to date that this is the fact in regard to the matter myself, but I just wonder if under the circumstances and under this consideration if it is specifically appropriate to consider *Mr. Kruses' role in organizing a group opposing this.* His considerations as far as the report are concerned as far as I can see go to the matter of the specific things which you have proposed. I take it from his comment he wants a study session with the Planning Commission relative to this. But *I am not inclined at this time to go into the matter of personal prejudice.* If you wish to take exception to this, I'll so note your exception.

Mr. Cory: Mac, may I ask a question? (yes.) **Oren,** if you'll share the ruling, I think we'll all abide by it, **but** *is it your contention—just yes or no—that this report that has been put before us is somewhat inaccurate because of a personal interest of the planning director?*

Mr. Dickason: *Yes, it is bias, that is correct.*

Mr. Kruse: May I say something?

Mr. Basinger: No, not at this time. I might say, **Mr.** Kruse, under the circumstances, and considering **beyond** that one remark that's been made, I think you'll have **ade-** quate time which is satisfactory to the commission in **this** regard. But, *I think to go into it now any further is improper.* Go ahead Mr. Dickason.

Mr. Dickason: Well, since all of the recommendations, the objections that the Planning Director has made still stand, I don't see of any way we can proceed here without answering everyone of them.

### Appendix No. VIII

#### Quotations From Objectors

To illustrate the opinions and sentiments of objecting Northland area residents in respect to Northwood Apartments I quote anonymously selected sentences from **the** letters of objection mailed to the city officials concerned with this project in early 1968, to-wit:

---

"My child as well as all taxpayers need a playground to play in."

---

"One family has already moved and three **more houses** are for sale in the eight hundred block of Northern **Avenue** now because of the possibility of such an apartment. **These** families are all friends."

---

"I do want to make one point quite clear. There **are** those who have spread rumors, that the residents of **North-** land, are against this apartment complex, because **we do** not want any Negroes living in the Neighborhood. **This**

is not the reason for being against the proposal. In fact we have Negro families living in the Northland neighborhood. They are good neighbors and work as hard at keeping their place nice as do the rest of us."

"This type of project is known to deteriorate by neglect due to lack of interest and frequent turnover of residents living there."

"The sewers would not take care of that many apartments."

"If, when I bought my home in Northland about eleven years ago, I had wanted to live on the edge of a ghetto I would have located on the edge of one of those already established in Bath or Perry Townships."

"Many thanks for listening and for any effort you may bend to nip this cancerous proposal in the bud."

"The poor of our community are in need of help by building their self respect and by developing their intellectual capabilities to the fullest (through schooling, etc.).
"Without this teaching, Northwood Apartments will end up run down, which will in turn lower the value of our property.
"If this project has to be built, I feel there must be a better location further away from this area."

"Northland is a residential area which represented to us eight years ago when we bought our home as a place where our neighbors would have ideas, ambitions and would be of an economic level comparable to ours. I feel that this area should be allowed to continue to represent the above qualities and attract people regardless of race, religion or creed who feel these are attributes necessary for raising their families."

"I feel certain the residents of Northland are not opposed to the normal processes of integration, but to thrust

two hundred families (many of whom would possess undesirable qualities) upon a refined and well kept neighborhood is highly objectionable."

"Shouldn't these apartments be built to replace the blight on the south side of the city, where better housing is what the Federal Government has in mind when lending money for better housing?

"Please do what you can to keep our section of Lima a safe and respectful place to live."

"We are not against the project in itself—but against what our neighborhood will be in a year's time, if this follows the trend as it has in other cities."

"We were completely satisfied and proud of our community until we heard of this project and now feel that we may be forced to move and lose money on our investment which we worked so hard to achieve."

"The transplanting of the poor and needy does not help them, because they can't afford to live where they are put. They have to be in the low income class to live in them, roughly $50-$55 a week income. Take $\frac{1}{4}$ of that for rent which they have to pay leaves them with about $40.00. Anyone that has 3-4-5 or more children knows that you can't pay utilities, feed, clothe, and send the children to school with that."

"If this is completed it will be a slum within a couple of years and why should we suffer loss for it?"

"Attorney Dickason also says Cogen will retain control and have complete say over who could rent the apartments. This is a complete falsehood. If the government says he has to rent to a certain amount of green men with purple wives he's going to have to find that number of green men or the government won't subsidize his project."

"I think the people of Northland should be given first consideration. We are here, we are established, we have a big investment in this part of Lima. Everything that most of us have is at stake. We have worked long and hard for what we have and the only uncertainties in our area can mostly be handled by our own Northland Neighborhood Association.

"Many elderly people have settled here as their last stop. They will not financially be able to make another move. I have six neighbors living around me in this category."

---

"I hate to see something like this come in and degrade us. Northland and Northlea is a quiet and respectable development and if this comes in I would be afraid to even leave my children outside Day or Night.

"Please don't think I'm hard hearted and do not want to help people. That is not true but as I said before I have worked and have helped my family get what we have and I don't believe in just handing something over to somebody. I think they should have to put some sweat and respect into what they have."

---

"Anyone using fundamental logic can easily see that this development would be detrimental to our property values and burden our school system beyond recovery."

---

"I bought in this vicinity because I did not wish to live in a low rent district. And I think Mr. Cogen is wrong in his views."

---

"We are personally opposed to these apartments for the possible re-occurrence of sewer problems of which we just recently rid ourselvs."

---

"They will only be a disaster to our schools, to our playgrounds, which already are inadequate, and also will lower the resale value of real estate."

---

"It is not realistic to believe that rent supplement units would even allow the present dwellings to hold at their present value."

"I also think it will create a greater social problem than it is trying to correct. At this time there is very much a feeling of ill will, in the Northland area."

"If this Apartment goes through, the valuation of Northland property will drop 40% in valuation."

"We are not especially against the project, but against it being erected in this location. We have been told by the Planning Commissioner that the area north of Robb Avenue has been doing a lot of face lifting since Northlea and Northland have been constructed. In other words, our section of Lima has been upgrading itself, while other sections are depreciating in value. Since this obviously is a slum clearance project, why can it not be erected where it is needed most instead of the site in question?"

"Being a property owner adjacent to the development we do not feel guilty in voicing our objections."

"Why are real estate agents advising people not to buy in Northland? We live close to where it is to go up and frankly *I am frightened* about it."

"I am very much against Mr. Cogen receiving tax dollars to supplement the rent. I think $130.00 a month for a one bedroom apt. is terrible. What would he get for the 2-3-4 bedrooms? I would be willing for taxes to go up to help for food and clothing but not to make a landlord rich."

"I certainly hope they can build it where the people are now and *keep the children in their own school* district."

"We intend to go along with any measures necessary, legal or otherwise to halt this project."

"We know that police protection to take care of this large influx of people who brag that they will not be controlled by laws they dislike (this from a direct statement of an officer to me personally) cannot be provided by the City of Lima."

"Northland in general is a fine place to live: it's clean, well maintained, and the people that live there (I believe) represent a cross-section of America's finest.

"I certainly hope you gentlemen will exercise your proven good judgment and recommend a site where it can successfully achieve the purpose for which it is intended."

"It should be further noted that those who work with the type of people in these income brackets (such as the Salvation Army) say that to pull them from their element tends to frustrate rather than to make them happy."

"The builder of this area promised the buyers that a recreation area would be built for their children, so far this has not been done. This would be a benefit and asset to our community."

"Somehow we feel that the complex will not attract the quality of citizenry which will be commensurate with the existing neighbors in this neighborhood."

Note: These letters illustrate, I believe, that several great misconceptions are widespread, viz.:

(1) That this is a low rent government housing project.

(2) That it means an extraordinary influx of Negro families with numerous children.

(3) That it means nearly every tenant will be receiving a rent supplement. and

(4) That the management will lose *all* control to H. U. D.

The truth, it seems to me, is that it is a private moderate rental facility where black families will be accommodated on an equitable quota basis for 21 years.

That unless Congressional appropriations get much larger quickly it is unlikely that as many as 20% of the units will receive any rent supplement, and I have ruled that appellant cannot equitably be compelled to accept rent supplement tenants after one-third of his units are so occupied if he so wishes.

My judgment in this case spells out appellant's right to manage and finds that equity entitles him to have a declaratory judgment in this regard; also, that he may formulate a fair rental program for managing these apartments and as a condition of tenancy may prescribe standards of cleanliness and tidiness provided that he uniformly enforces them as to all tenants.

FHA Form No. 2503A—MODEL FORM OF LEASE (for use under rent supplement program) already provides as much although par. 22 therein reads:

"Failure of the LANDLORD to insist upon the strict performance of the terms, covenants, agreements and conditions herein contained, or any of them, shall not constitute or be construed as a waiver or relinquishment of the LANDLORD's right thereafter to enforce any such term, covenant, agreement, or condition, but the same shall continue in full force and effect."

I do hold simply that if any LANDLORD uses this provision for the purpose of discrimination between tenants he will not be upheld in court because facilitating such purpose would be inequitable and consequently not permissible.